UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARISTA RECORDS, INC., et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 03 1474 RCL |
| v. | ) |
| | ) |
| SAKFIELD HOLDING COMPANY S.L., a Spanish | ) |
| company d/b/a PURETUNES.COM and DOES 1-10, | ) |
| | ) |
| Defendants. | ) |

## OPPOSITION TO DEFENDANT SAKFIELD
## HOLDING COMPANY S.L.'S MOTION TO DISMISS

Plaintiffs Arista Records, Inc., *et al.*, hereby file this Opposition to Defendant Sakfield

Holding Company S.L's ("Sakfield") Motion to Dismiss for Lack of Personal Jurisdiction.

Sakfield's motion to dismiss should be denied because Sakfield's operation of the

PureTunes website was purposely targeted toward U.S. consumers (including those in the

District of Columbia), Sakfield's fraudulent representations were made to U.S. consumers

(including those in the District of Columbia), and because Sakfield infringed U.S. copyrights on

U.S. soil by selling copies of copyrighted sound recordings without Plaintiffs' authorization to

U.S. residents. By offering for sale over the Internet copyrighted sound recordings, Sakfield

necessarily availed itself of the District of Columbia and has subjected itself to the courts of the

United States.

Furthermore, Sakfield's motion should be denied because Sakfield is a Spanish company

in name only. As confirmed by the limited discovery that has been completed to date, Sakfield is

owned and operated by U. S. citizens who reside in – and have controlled PureTunes from – the

United States, and who have admitted to third parties that they set up multiple foreign shell

companies to hide their involvement and make it harder for copyright owners to come after them.

Thus, contrary to Sakfield's suggestion that this case should be tried in Spain, it is clear that most of the evidence and witnesses in this case are on this side of the Atlantic. Sakfield, through its U.S. principals, contracted with a D.C.-based Internet service provider to provide the Internet services needed to handle the high volume of users downloading simultaneously. Sakfield, through its U.S. principals, contracted with a New York company to host the PureTunes Site and the music files that users would download from the PureTunes site. And Sakfield, again through its U.S. principals, contracted with a U.S.-based public relations firm to devise a U.S. marketing plan to support the launch of PureTunes. Notwithstanding Sakfield's aggressive efforts to obstruct the party and third-party discovery ordered by this Court (this is discussed more fully below), the existing record makes clear that PureTunes was controlled and operated from the United States, that PureTunes deliberately and actively targeted U.S. consumers, and that any purported connection to Spain (or any of the multiple other foreign countries involved in Sakfield's corporate web) is simply a sham to make prosecution more difficult.

Although the Court certainly could deny Sakfield's motion to dismiss now, based on the allegations in the complaint and evidence gathered to date, Plaintiffs believe that the better course is for the Court to authorize a limited period of jurisdictional discovery. Jurisdictional discovery is liberally allowed in the D.C. Circuit and is available whenever such discovery can supplement the allegations made by the Plaintiffs. *See Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991). There is an especially strong case for jurisdictional discovery in this matter. This Court has already authorized Plaintiffs to take immediate discovery to ascertain the identities of the individuals behind the PureTunes website, as well as to find the location of the contraband database of Plaintiffs' copyrighted works that has been used to infringe Plaintiffs' copyrights. Allowing Plaintiffs to pursue jurisdictional

discovery prior to ruling on Sakfield's motion – combined with clear direction from the Court to compel Sakfield to respond fully to discovery already propounded and to cease its efforts to obstruct discovery of its agents, contractors, and others – will most quickly ensure that all relevant parties are brought before this Court and will give the Court the information it needs to conclude that it has jurisdiction and is fully empowered to bring those who are behind the PureTunes website to account.

Finally, the Court should reject out of hand Sakfield's other arguments about venue, comity, and *forum non conveniens*. Venue is necessarily proper in this Court if it has personal jurisdiction over Sakfield. Moreover, Spain does not provide an alternative forum for this case. Sakfield has provided no proof that Spanish law will allow Plaintiffs to pursue all of their claims, nor can it show that the U.S. principals behind PureTunes are subject to the compulsory process of the Spanish courts. Moreover, the key evidence and witnesses in this case are not in Spain, or in any of the foreign havens where Sakfield's parent companies were incorporated, but rather in the United States with the individuals who own and have controlled and operated the PureTunes website. There is no court better situated to address their conduct than this one.

## BACKGROUND

*Plaintiffs' Complaint*

Plaintiffs' jurisdictional allegations are simple and straightforward. Sakfield operated the PureTunes website, which offered to anyone in the world, including residents of the District of Columbia and the United States, copies of Plaintiffs' copyrighted works, without Plaintiffs' authorization. Complaint in *Arista Records, et al v. Sakfield Holding Company S.L.*, Civ. Act. No. 03-1474 (RCL), ¶ 2 (hereinafter "Complaint"). The PureTunes website was fully interactive. Complaint ¶ 20. Users could purchase sound recordings over the Internet without

making a phone call, visiting a store, or doing anything other than providing PureTunes with personal information and a credit card. *Id.*

Plaintiffs have alleged that Sakfield was conducting business in the District because it was undoubtedly offering for sale to residents of the District Plaintiffs' copyrighted sound recordings. *See* Complaint ¶ 11 ("Defendant Sakfield has directed electronic activity into the District of Columbia with the manifest intent of doing business here. Defendant Sakfield was either aware, or should have been aware, of continuous commercial interaction with residents of the District of Columbia."). To that end, Plaintiffs identified several hundred sound recordings that were being offered by Sakfield to anyone that wanted to download them through the PureTunes service. Exhibit A to Complaint. The Complaint also included allegations that Sakfield did not simply offer copyrighted sound recordings for sale – it actually sold them. Complaint ¶ 11. Given that the PureTunes website was available to anyone on the Internet, Plaintiffs also alleged that some of the PureTunes' sales were to people in the District of Columbia. Complaint ¶ 11 ("Defendant Sakfield has entered into sales agreements over the Internet with residents of the District of Columbia involving the knowing and repeated distribution of Plaintiffs' Copyrighted Recordings to residents of the District of Columbia."). Plaintiffs also alleged that Sakfield derived revenue from its sales in the District and, commensurately, caused harm to Plaintiffs in the form of lost sales of sound recordings to District residents. Complaint ¶ 11 ("Defendants have derived revenue from sales in the District of Columbia. Defendants were aware, or should have been aware, that their conduct would cause injury in the District of Columbia and to residents of the District, and that Plaintiffs have been harmed by business conducted by Defendants in the District of Columbia."). In addition to its acts of copyright infringement, Plaintiffs also alleged that defendants engaged in tortious conduct by falsely or misleadingly claiming that PureTunes was authorized by the copyright

4

holders to sell copyrighted works. Complaint ¶¶ 25-26. Such misrepresentations interfered with Plaintiffs' business opportunities in the United States. Complaint ¶ 27.

Contrary to Sakfield's attempt to portray Plaintiffs' claims as arising in Spain, the claims identified in Plaintiffs' Complaint are directed toward illegal conduct in the United States based on the PureTunes website. The core of Plaintiffs' copyright infringement claims are based on violation of U.S. copyrights, caused by Sakfield offering for sale and selling in the United States Plaintiffs' copyrighted works without Plaintiffs' authorization through the PureTunes website. Likewise, Plaintiffs' common law and Lanham Act claims are all based on Sakfield's knowing misrepresentations to U.S. residents, who were persuaded to purchase music from PureTunes believing (wrongly) that PureTunes was selling sound recordings legally. Complaint ¶¶ 3-5, 26.

Moreover, as Plaintiffs alleged in their Complaint, Sakfield's contacts with the United States and the District of Columbia were not mere happenstance caused by the operation of a website. Sakfield knowingly and intentionally directed its marketing and business efforts into the United States, including the District of Columbia. The PureTunes website (i) was in English and was intentionally configured to be made available to U.S. citizens (Complaint ¶ 18) ; (ii) sold music by well-known American artists (Complaint ¶ 2); and (iii) offered its products for sale in U.S. dollars and accepted U.S. dollars as currency (Exhibit B to Complaint). Finally, Plaintiffs alleged in their Complaint that, rather than using an Internet Service Provider in Spain, Sakfield contracted with a D.C.-based ISP – Cogent Communications – to provide Internet access to the PureTunes website. Complaint ¶ 12.

### Discovery to Date

This Court previously has authorized early discovery in this case directed toward finding the individuals behind the PureTunes website and locating the database of contraband songs being used by Sakfield. *See* Order granting Plaintiffs' Motion for Leave to Take Immediate

Discovery (July 22, 2003); Minute Order granting Motion for Leave to Take Discovery of
RACO (Aug. 4, 2003); *and* Minute Order denying Defendants' Motion for Temporary Stay of
Discovery (Sept. 15, 2003). Such discovery has proceeded slowly to date because Sakfield
appears willing to take any steps it can to obstruct discovery and prevent relevant parties from
bring brought before the Court.

Despite the Court's three orders authorizing such discovery to proceed, Sakfield, through
its counsel, has sought to obstruct discovery with threatening letters both to Plaintiffs and to the
third parties against whom the Court has authorized discovery. Those letters warn third parties
that they may not turn over Sakfield confidential information to Plaintiffs. *See* August 26, 2003
letter from Schwartz to Remote Access Co., Ltd. (instructing recipient not to respond to
discovery requests) and August 26, 2003 letter to counsel for Plaintiffs (Exhibit 1). At the same
time, Sakfield appears to interpret virtually everything as confidential.[1] Such threats have
slowed discovery greatly, as has the difficulty in serving the U.S. individuals whom Sakfield, in
its interrogatory responses, calls "independent consultants," but who have admitted to others to
being the ultimate owners of Sakfield. *Compare, e.g.,* Griffin Dep. at 31:13-32:19, 36:8-16
(testifying that Wayne Rosso admitted that he, along with Daniel Rung, Matthew Rung and
Michael Rung, own PureTunes) (Exhibit 2) *with* Defendant's Responses to Plaintiff's First Set of

---

[1] Sakfield's lawyers have claimed, for example, that all telephone calls, including those between
people all physically present in the United States, are confidential pursuant to the Spanish
Constitution. *See, e.g.,* Griffin Dep. at 48:9-49:6 (Exhibit 2). Indeed, Sakfield claimed
confidentiality over Mr. Griffin's entire deposition transcript notwithstanding that Mr. Griffin
had testified (a) that he was a third party who had no relationship (ownership, business,
consulting, or otherwise) with Sakfield, *id.* at 15:18-17:17; (b) that the information he had about
the true owners of Sakfield and PureTunes came from a couple of unsolicited telephone calls
from Mr. Wayne Rosso, *id.* at 19:12-20:13; (c) that he did not have any agreement or
understanding with Mr. Rosso – nor did Mr. Rosso even ask – that their discussions should be
kept confidential, *id.* at 26:23-27:10; and (d) that he did not consider the information confidential
since he had received all of the same information about the "secret" owners of Sakfield from a
former colleague of his, who also had spoken with Mr. Rosso, *id.* at 27:11-18.

Interrogatories, No. 2 (identifying the Rungs as "independent consultant[s] to Sakfield" and Mr.

Rosso simply as a "Grokster employee") (Exhibit 3).  When not being misleading or evasive,

Sakfield's answers to discovery propounded to it have bordered on the absurd.  Sakfield has, to-

date, produced no documents (in Spanish or English) created by Sakfield; indeed, Sakfield has

produced a total of eight (8) pages of documents which consist exclusively of the subpoena

issued by Plaintiffs' trade association, the Recording Industry Association of America ("RIAA"),

to Sakfield's ISP, Cogent Communications, seeking to learn Sakfield's identity, Cogent's letter

to Sakfield advising Sakfield of the RIAA subpoena, and Cogent's response to the RIAA.  *See*

Defendant's Response to Plaintiff's First Request for Documents (Exhibit 4).  Sakfield has

provided cryptic one-word answers in response to basic interrogatories.  (*See* Exhibit 3).  And,

incredibly, Sakfield purports not to know the physical location of its database of infringing

works, to have never communicated with clients or customers of the PureTunes website, to have

no copy of its own website, no records of communications with customers, and no information

about who the ultimate owners of the PureTunes Site are.  Responses to Interrogatory Nos. 1, 6,

12 (Exhibit 3); Responses to First Requests for Documents Nos. 9, 13 (Exhibit 4).[2]

---

[2] Given this Circuit's clear views on allowing jurisdictional discovery, before filing this opposition, Plaintiffs sought to reach agreement with Sakfield as to a schedule for Plaintiffs' opposition which would allow a short period of time for jurisdictional discovery.  Plaintiffs offered fair concessions to avoid the expense of briefing this opposition, including suggesting that, if the deposition of any Sakfield witness resident in Spain became necessary, Plaintiffs would travel to Spain to conduct the deposition.  Sakfield's position in those negotiations was consistent with – indeed, emblematic of – their efforts to obstruct and delay third party discovery.  Sakfield indicated, among other unreasonable conditions (including that Plaintiffs must pay for Sakfield's lawyers' travel to Spain), that their consent was conditioned upon Plaintiffs agreeing to stay all third-party discovery, including the discovery that this Court twice has ordered may proceed as well as any discovery of third parties related to the jurisdictional issues.  *See* Sept. 15, 2003 Letter from Lawrence Sung to Steven Fabrizio (Exhibit 5).  This, of course, would have left Plaintiffs at the mercy of Sakfield's own discovery responses, which have been less than forthright or forthcoming.

Despite Sakfield's efforts to derail discovery, the discovery that has occurred has further demonstrated that it is the United States, and not Spain, that is the locus of this action. For example, sworn third party testimony indicates that Mr. Wayne Rosso admitted (to the witness and apparently others) that – at the end of the trail of foreign shell corporations – he and three other U.S. citizens, Daniel Rung (who goes by the alias Henry Wilson), Mathew Rung (Daniel Rung's son), and Michael Rung (Daniel Rung's brother) are the true owners of PureTunes:

> "Q. Did he [Rosso] say who really owned Puretunes?
>
> A. Well, he represented to me that himself, Daniel Rung, Matt Rung and Michael Rung owned Puretunes, at the end of all the trails." Griffin Dep. at 32:7-10 (Exhibit 2).

* * *

> "Q. Okay. So there's no ambiguity in the record, Mr. Rosso told you in no uncertain terms that he, Daniel Rung, Matthew Rung and Michael Rung were the ultimate owners of the Puretunes site, is that correct?
>
> A. Yes." Griffin Dep. at 36:8-16 (Exhibit 2).

Rosso also admitted to Mr. Griffin that PureTunes was set up with multiple foreign intermediary companies in order to hide the involvement of Rosso and the Rungs:

> "Q. What did Mr. Rosso tell you about the ownership of Puretunes, the Puretunes site?
>
> A. Well, I'm not sure I got all of it, but he described to me that it was going to be very hard and take a very long time, because of international law, for anyone to ever determine who really owned what. They had started with a company that [he] represented to be Sakfield Holding Company, I believe that's the correct spelling, it's an SA, which is Spain.
>
> I didn't know why he had to be SA, but he told me it was an SA. And then he said, but Sakfield is owned by Chantik Financial Services BV in Amsterdam, and he went on to talk about the merchant account in Holland. *And he explained to me that, by setting up all these different companies, it would take a very long time to determine who really owned what.*" Griffin Dep. at 31:13-32:6 (emphasis added) (Exhibit 2).

8

\* \* \*

> "Q. To be clear for the record, did he [Rosso] state to you explicitly that part of the reason for using the foreign companies was to hide the involvement of Mr. Rosso and the Rungs?
>
> A. Yes." Griffin Dep. at 33:24-34:4 (Exhibit 2).

*See also* Griffin Dep. at 33:11-15 (" ... by putting it over there, it made it harder for U.S. jurisdiction and the content owners to come after a company overseas, as referenced by the great difficulty he said people were having with Kazaa.") (Exhibit 2).

As one might expect of a company being operated from the U.S. by U.S. citizens, Sakfield established business relationships with U.S. (and D.C.) vendors, contractors, and consultants. For example, Sakfield contracted with a D.C.-based Internet Service Provider, Cogent Communications, to provide telecommunications services to allow people to access its website; Sakfield had repeated and ongoing contact with Cogent, as it sought to increase the bandwidth available to it so that more consumers could access the website (causing more infringement of Plaintiffs' copyrights). *See* Contract between Sakfield and Cogent Communications, Inc. & E-mail from Cogent Communications, Inc. in D.C. to Sakfield confirming agreement (Exhibit 6).[3] Sakfield contracted with a New York-based company (RACO) to provide facilities that housed the computer servers operating the PureTunes website. *See* Correspondence between Sakfield managing director and RACO re contract between the parties (redacted) (Exhibit 7). In its interrogatory responses, Sakfield characterized RACO as its "operations center contractor." Sakfield Response to Interrogatory No. 2 (Exhibit 3). And, Sakfield hired a U.S. public relations firm to plan a U.S. marketing campaign to support the

---

[3] Although a Cogent Canadian affiliate appears to have provided Internet access service to the PureTunes website, the contract was between Sakfield and Cogent of the District of Columbia, as was much of the correspondence and ongoing communication. *See* Exhibit 6.

launch of PureTunes. Griffin Dep. at 38:14-39:20 (Exhibit 2), evidencing further that PureTunes
was affirmatively targeting a U.S. audience.

Plaintiffs anticipate that further discovery will only confirm what these initial efforts have
yielded – Sakfield is merely the front for U.S. residents, operating an infringing business from
the U.S., targeting U.S. consumers, selling infringing works to U.S. residents, contracting with
U.S. consultants, vendors and other third-parties, and using foreign shell corporations in a very
deliberate effort to hide their involvement and evade prosecution under U.S. copyright laws.

**ARGUMENT**

Plaintiffs have made out a prima facie case that the Court has personal jurisdiction over
Sakfield; no more is required to defeat a motion to dismiss. As the D.C. Circuit has made clear
in *Gorman v. Ameritrade Holding Co.*, 293 F. 3d 506, 512 (D.C. Cir. 2002), a company that uses
cyberspace to sell a product to residents of the District must expect to be haled into the courts of
the District of Columbia. Just like a business that has a brick-and-mortar store on K Street, those
who market and sell to residents of the District through cyberspace can be called to account here.

As discussed more fully below, however, Plaintiffs believe that the best course of action
is for the Court to authorize jurisdictional discovery, to catalog thoroughly Sakfield's contacts
with the United States, as well as those of the Doe defendants who have yet to be added. Unlike
most cases, the key discovery in this case will not be about the merits of Plaintiffs' underlying
claims – there can be no dispute that Sakfield, through the PureTunes website, infringed
Plaintiffs' copyrights. The challenge in this case is to track down the true perpetrators who are
behind Sakfield and PureTunes. Jurisdictional discovery – backed by a clear message from the
Court that Sakfield and its collaborators must comply or face stiff penalties – is the most
effective means to bring those who should be before this Court here as soon as possible. After

10

such a period of discovery, the Court can fully consider Sakfield's claim, with all appropriate

parties before the Court.

## I.   PLAINTIFFS HAVE MADE OUT A PRIMA FACIE CASE OF PERSONAL JURISDICTION AGAINST SAKFIELD

Plaintiffs need only make out a prima facie case that jurisdiction exists to defeat

Sakfield's motion. *See Crane v. New York Zoological Society*, 894 F.2d 454, 458 (D.C. Cir.

1990). Moreover, Plaintiffs' allegations must be accepted as true and must be accorded all

reasonable inferences that may derive from the facts alleged. *United States v. BCCI Holdings*,

980 F. Supp. 21, 26 (D.D.C. 1997). Thus, a court should only dismiss for lack of jurisdiction if it

appears "beyond doubt that the [Plaintiffs] can prove no set of facts in support of [their] claim

that would entitle [them] to relief." *Kenneda v. United States*, 880 F.2d 1439, 1442 (D.C. Cir.

1989) (internal citation omitted).

A court may exercise either "specific jurisdiction" over a defendant, in cases where a

claim at issue arises out of or relates to the defendant's contacts with the forum state, *see Burger*

*King Corp. v. Rudezewicz*, 471 U.S. 462, 472 & N.15 (1985), or "general jurisdiction," in any

case where the defendant's contacts with the forum state are "continuous and systematic."

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984). Under the

District of Columbia long-arm statute, a court in D.C. has specific personal jurisdiction over any

entity for an action "arising from" the entity's "transacting any business in the District of

Columbia." D.C. Code Ann. 13-423(a) (1981). That provision of the long-arm statute extends

the jurisdiction of the D.C. courts to the full extent permitted by the Due Process Clause of the

Constitution. *See United States v. Ferrara*, 54 F. 3d 825, 828 (D.C. Cir. 1995). Moreover,

pursuant to the theory of general jurisdiction, even if the claim at issue does not arise from a

defendant's conduct in the District, the D.C. long-arm statute permits jurisdiction if the

defendant is "doing business" in the District.  See D.C. Code 13-334(a).  This provision also is co-extensive with the Constitution.

To satisfy the constitutional minimum under the Due Process Clause, Plaintiffs must only show that that Sakfield has "minimum contacts" with the forum such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  A court will find "minimum contacts" in any case where the defendant's conduct is "such that he should reasonably anticipate being haled into court" in the forum. *World-wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Importantly, because Plaintiffs' claims of copyright infringement and violation of the Lanham Act arise under federal law, even if Sakfield had insufficient contacts with the District of Columbia, the Court nonetheless would have jurisdiction as long as Sakfield had sufficient minimum contacts with the United States as a whole.  Fed. R. Civ. P. 4(k)(2); *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717, 720 (5th Cir. 1996) ("Rule 4(k)(2) thus sanctions personal jurisdiction over foreign defendants for claims *arising under federal law* when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state."); *Quokka Sports, Inc. v. Cup Int'l Ltd.*, 99 F.Supp.2d 1105, 1110-11 (N.D. Cal. 1999) (applying Rule 4(k)(2) to Lanham Act claim).  Pursuant to Rule 4(k)(2), foreign entities cannot evade the jurisdiction of the U.S. courts by having a few contacts with many states, but not concentrating them in any one.

The advent of the Internet has not altered these fundamental principles.  A defendant cannot seek to evade the jurisdiction of a federal court by claiming that it does all of its business in "cyberspace." *Gorman*, 293 F.3d at 512.  Entities that conduct their business over the Internet can be brought into court anywhere they transact business, whether the transactions are done

12

over the phone, by e-mail, or on a website. *Id.* In analyzing jurisdiction over operators of Internet sites, the courts have looked at a so-called "sliding scale," based on whether the website is used for commercial activity and is interactive with consumers in the forum state. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (articulating a commonly applied sliding scale test). At one end of the continuum are purely passive websites that provide information but no opportunity for interaction with forum residents; such websites, without more, generally will not provide sufficient contacts to establish personal jurisdiction over the website operator. *See Mink v. AAAA Development*, LLC, 190 F. 3d 333, 336-37 (5th Cir. 1999) (denying jurisdiction where customers could not transact business or purchase anything on-line). In contrast, a website that offers products for sale over the Internet and is thus fully interactive with customers in the forum state will generally have sufficient contacts to justify an assertion of jurisdiction. *See Gator.com Corp. v. L.L. Bean, Inc.*, 2003 WL 22038396 (9th Cir. 2003); *Bird v. Parsons*, 289 F.3d 865, 874-75 (6th Cir. 2002); *Zippo Mfg. Co.*, 952 F. Supp. at 1124 ("If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper."). Interactive websites essentially create a "virtual store." *Gator.com*, at *5. Where a defendant has chosen to operate its sales and marketing efforts through an interactive website, its contacts with residents in each state cannot be said to be "fortuitous" or "random." *Burger King,* 471 U.S. at 475. Rather, in such cases, defendant has purposefully availed itself of the forum state and had directed its marketing activities there such that the exercise of jurisdiction is permissible.

In addition to looking at whether a particular website is "interactive," courts will also look to other factors suggesting that the website operator has purposefully availed itself of the forum. *See GTE New Media Services Inc. v. Bellsouth Corp.*, 199 F.3d 1343, 1348 (D.C. Cir.

2000). Thus, even if the website is not itself interactive, *i.e.*, one cannot complete a sale on the website, a website operator that markets to the customers in particular forum will be found to have availed itself of the forum's jurisdiction. *See Compuserve, Inc. v. Patterson,* 89 F.3d 1257, 1264 (6th Cir. 1996); *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883 (6th Cir. 2002). Similarly, where a website operator has entered into contracts in the forum state, a court will be more inclined to find jurisdiction. *Id.* Finally, where a defendant's conduct through the website has significant effects in the forum, a court is also likely to find jurisdiction. *See Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1322 (9th Cir. 1998).

Sakfield's argument on personal jurisdiction mischaracterizes both controlling case law and Plaintiffs' allegations. Sakfield relies principally on *GTE,* but its imaginative reading of that case has been wholly foreclosed by the D.C. Circuit. In *GTE,* the D.C. Circuit held that jurisdiction was not proper based on the "mere accessibility of the defendants' websites"; defendants in that case did not engage in any business transactions through their website. *GTE,* 199 F.3d at 1350. Subsequently, in *Gorman,* the Circuit considered jurisdiction over the operator of a fully interactive website that offered securities transactions and brokerage services over the Internet to residents in all 50 states and the District of Columbia. 293 F.3d at 513. In that case, Ameritrade made exactly the same argument that Sakfield makes here. *See Gorman,* 293 F.3d at 512 (rejecting Ameritrade's argument that *GTE* stands for the proposition that "Internet-based transactions are outside the jurisdiction of District of Columbia courts"). The panel, however, rejected that argument, holding that the assertion of jurisdiction over the website is appropriate where the website engages in electronic transactions with residents of the forum state. *Gorman,* 293 F.3d at 512-13. "[B]y permitting . . . transactions to take place 24 hours a day, the site makes it possible for [the defendant] to have contacts with the District of Columbia that are 'continuous and systematic.'" *Id.* at 513.

The PureTunes website is just such a website – it was offering music for sale to consumers in the District (and everywhere else) – 24 hours per day.  Under *Gorman*, that is sufficient to establish *general* jurisdiction over a website operator, even if the claims at issue did not involve activities in the forum.

But in this case, the Court also has specific jurisdiction because Plaintiffs' claims, contrary to Sakfield's suggestion, do arise from Defendants' tortious conduct and other violations of law *in the District*.  Plaintiffs have alleged that Sakfield violated Plaintiffs' copyrights in the District of Columbia by selling copyrighted sound recordings without a license to residents of the District.  Such D.C. customers also were victims of Sakfield's fraud in claiming that the purchase of such sound recordings was fully legal.  Although Plaintiffs are seeking compensation for all of the acts of infringement committed by Sakfield pursuant to U.S. copyright law, there can be little doubt that some number of those acts of infringement occurred in D.C. and involved D.C. residents.

No more is required to allege a prima facie case of personal jurisdiction under the D.C. long-arm statute.  Plaintiffs, of course, have alleged more and have already adduced evidence that prove Plaintiffs' allegations.  Plaintiffs have demonstrated that Sakfield chose an ISP based in D.C. to provide Internet access for the PureTunes website.  (Exhibit 6).  Plaintiffs have also uncovered evidence that PureTunes did sell copyrighted music in the District – to one of the employees of its ISP.  E-mail dated May 21, 2003, from Cogent employee in D.C. re experience with PureTunes (redacted) (Exhibit 8).  While it was operational, the PureTunes Site apparently generated U.S. $5,000 a day in customer subscriptions.  Griffin Dep. at 37:8-38:9, 40:2-13 (Exhibit 2).  Thus, PureTunes likely had thousands or perhaps tens of thousands of customers.  Indeed, those behind the PureTunes Site had to seek additional bandwidth from their ISP in order to handle all of the consumers who believed they were lawfully purchasing music from a

15

licensed website. (redacted) (Exhibit 9). The jurisdictional discovery Plaintiffs have requested would prove that many users were resident in the District of Columbia.

Even if Plaintiffs had not alleged a prima facie case of both specific and general jurisdiction over Sakfield, the Court would need to consider Sakfield's contacts with the entire United States. There can be no doubt that Sakfield purposefully and intentionally marketed the PureTunes website to residents of the United States. The website was in English, sold popular songs by U.S. artists, and accepted U.S. dollars as currency for transactions. *See* screen shot from PureTunes Site (Exhibit 10). Undoubtedly, further discovery would demonstrate that the substantial percentage of PureTunes users were U.S. residents. Moreover, as discussed above, Plaintiffs have evidence of additional contacts with U.S. vendors and contractors – and evidence revealing that the unseen hands behind Sakfield are U.S. citizens who actually reside in, and controlled PureTunes from, the United States, and set up a web of off-shore corporations to hide their involvement. *See supra* pp. 8 to 9.

Plaintiffs have therefore met their burden at this early stage to allege facts that would establish personal jurisdiction over Sakfield.

## II.   THE COURT SHOULD ORDER JURISDICTIONAL DISCOVERY SO THAT PLAINTIFFS AND THE COURT CAN GET ALL OF THE RELEVANT FACTS AND PARTIES BEFORE THE COURT

Although Plaintiffs' allegations and the limited discovery to date are more than sufficient to defeat Sakfield's motion to dismiss, Plaintiffs believe that the best course is for the Court to authorize Plaintiffs to engage in discovery as to the issues raised in Sakfield's motion. Discovery on personal jurisdiction is liberally granted whenever a party has "a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Caribbean Broad Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998); *Edmond*, 949 F.2d at 425 (jurisdictional discovery should be "freely permitted");

*Diamond Chemical Co. v. Atofina Chemical Co.*, 2003 WL 21464563, at *15 (D.D.C. 2003) ("This Circuit's standard for permitting jurisdictional discovery is quite liberal."). The D.C. Circuit has held that, even where a plaintiff's sole allegation is that defendant operates an *non-interactive* website that plaintiff claims had effects within the district, jurisdictional discovery is required. *GTE*, 199 F.3d at 1351-52; *see also Crane*, 814 F.2d at 760 (holding that it was an abuse of discretion to deny jurisdictional discovery).

Plaintiffs request this jurisdictional discovery so Plaintiffs can provide the Court with a complete record of Sakfield's D.C. and U.S. contacts. As is quite evident now, Sakfield's "strategy" from the beginning was to use multiple foreign companies in multiple foreign jurisdictions to evade prosecution. If Plaintiffs, quite fortuitously, had not learned of Rosso's boasting to various third parties of his and the Rungs' ultimate ownership of PureTunes, Defendants' strategy may very well have been successful. Clearly, Sakfield is only the beginning of a chain that leads back to those who are responsible for this illegal activity. While Plaintiffs now know of the involvement of four U.S. citizens, there may be others still hiding. Sakfield has admitted that it is owned by a chain of corporations that end with a company incorporated in Bermuda (although Sakfield has provided no information as to who ultimately owns and controls its operations). Sakfield Response to Interrogatory No. 1 (Exhibit 3). The jurisdictional discovery, together with the discovery already ordered by the Court, will enable Plaintiffs to present to the Court a complete record identifying the culpable parties and demonstrating Defendants' pervasive presence in the United States and D.C.

For Plaintiffs to achieve a just result in this case, those who actually control Sakfield must be brought before this Court and the various entities that have information about Sakfield, whether they are contractors, consultants, or vendors, must be required to produce documents in response to Plaintiffs' requests. To date that has not happened because Sakfield has threatened

third parties with generic claims of breach of confidentiality and because of the difficulties of obtaining discovery across international boundaries.

Sakfield and those behind it no doubt were counting on such difficulties to slow or stop pursuit by copyright owners, such as Plaintiffs. Jurisdictional discovery, backed by a strong message from the Court, could significantly speed this case.

Plaintiffs therefore respectfully request a 60-day period of jurisdictional discovery. In that time, Plaintiffs would seek to obtain additional evidence demonstrating Sakfield's contacts with the United States, particularly its contracts and transactions with D.C. residents. Plaintiffs also will continue their court-ordered discovery in an effort to bring before the Court all of the parties that should be defendants in this action. Specifically, as to the jurisdictional issues, Plaintiffs would propose discovery to Sakfield and its so-called "consultants" to determine the full range of their dealing in the United States generally and D.C. in particular. Plaintiffs also will seek such documents and testimony from third-parties that likely have information concerning Sakfield's U.S. and D.C. contacts. The third-parties of which Plaintiffs are currently aware are also third-parties that Plaintiffs have subpoenaed, or would otherwise be planning to subpoena, in connection with the discovery already ordered by the Court, as these witnesses are likely to have information about the identities of the Doe defendants and/or the whereabouts of the infringing music database. Thus, much of the proposed third-party jurisdictional discovery is overlapping with discovery already planned. The results of jurisdictional discovery from Sakfield may reveal additional third-party witnesses who have important information.

Sixty days will be enough time, however, only if Sakfield ceases to obstruct Plaintiffs' discovery efforts and requires its agents, vendors, and consultants to produce to Plaintiffs all of

the documents they possess concerning the PureTunes website.[4] Plaintiffs note that Sakfield should have produced many of those documents already because, undoubtedly, documents held by its vendors, consultants, and contractors, are within its control. *McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 78 (D.D.C. 1990) (holding that "control" for purposes of Federal Rule 34 is broadly construed).  To date, claiming confidentiality, Sakfield itself has not produced such documents, and it has prevented third parties from doing so as well.  Thus, Plaintiffs request that the Court not only authorize jurisdictional discovery, but also order Sakfield to cooperate fully with efforts to obtain such discovery by, among other things, authorizing its third-party agents (consultants, contractors, and vendors) to turn over relevant documents and information immediately, and without requiring Plaintiffs to go through international discovery processes, such as those required by the Hague Convention.[5]

---

[4] In the event that Sakfield continues to obstruct discovery and/or fails to ensure that documents from its vendors, agents, and consultants are made available (or for other appropriate reasons), Plaintiffs reserve the right to seek additional time from the Court or to ask this Court for other remedies.

[5] For example, Sakfield claims to have no documents reflecting communications with its subscribers. Sakfield Response to Document Request No. 11 (Exhibit 4).  That suggests that all of the documents reflecting communications with subscribers, including billing and other information that would reflect the sale of the PureTunes service and the locations of subscribers, reside with some one else, likely a third-party contractor, such as Bibit, whom Sakfield has identified as its "payment services contractor."  Sakfield Response to Interrogatory No. 2 (Exhibit 3).  If jurisdictional discovery is to be of any use, it must be clear that Sakfield is obligated to obtain and provide these documents and/or authorize such entities to provide such information expeditiously to Plaintiffs.

## III.   SAKFIELD'S ARGUMENTS AS TO VENUE, FORUM NON CONVENIENS, AND COMITY ARE WITHOUT MERIT

Sakfield would have the Court believe that the locus of this action is in Spain, that documents and evidence reside in Spain, and that the case must be litigated there. Those arguments are nothing less than an attempt to dupe this Court.[6]

As an initial matter, "the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). Thus, even where a defendant demonstrates that an alternative forum exists and that there may be some added convenience to litigating in a foreign tribunal, dismissal based on the ground of *forum non conveniens* (or comity) is very much the exception, not the rule. It is the defendant's burden to establish that an adequate alternative forum exists. *BPA International, Inc. v. Sweden, et al.*, 2003 WL 22110323, at *8 (D.D.C. 2003) (citing *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996). Sakfield has not done so.

Sakfield's argument appears predicated on its conclusory assertion that Plaintiffs could obtain some redress in the Spanish courts. Sakfield provides no support for its argument, other than to claim that some of the Plaintiffs in this case have brought a case against a different website in Spain (Weblisten.com). Sakfield Motion at 10. That argument is wrong as a matter of fact and as a matter of law. The Weblisten case involved violations of Spanish copyrights in Spain through sales of infringing works to residents of Spain. That action, moreover, was brought not by these Plaintiffs, but by Spanish record companies, some of which are affiliates of Plaintiffs. In contrast, this case involves violations of U.S. copyrights in the United States through sales of infringing works to residents of the United States. It is wholly appropriate for a

---

[6] Sakfield's argument as to venue is wholly dependent on its assertions about personal jurisdiction. If this Court has jurisdiction over Sakfield, a foreign corporation, venue is necessarily proper. 28 U.S.C. § 1391(d).

Spanish court to consider the former case, but wholly inappropriate for a Spanish court to decide this case. *See Subafilms Ltd. v. MGM-Pathe Communications, Co.*, 24 F.3d 1088, 1096 (9th Cir. 1994) (en banc) (noting that copyright laws are fundamentally territorial in nature). Sakfield cites *Jackson v. American University in Cairo*, No. 01-5311, 2002 WL 31818236 (D.C. Cir 2002), to buttress its point that private and public factors must be weighed in applying the doctrine of *forum non conveniens*. But that unpublished decision rested on an unrebutted "affidavit from an Egyptian attorney regarding the adequacy of the forum." *Id* at *2. Sakfield has not offered any such proof, but asks this Court to rely on rhetoric alone.

Sakfield's claim that Spain is an adequate alternative forum for this case fails for two additional reasons. First, Sakfield has not met its burden to demonstrate that all of Plaintiffs' claims, including their claims alleging fraudulent misrepresentations to U.S. consumers and tortious interference with Plaintiffs' business opportunities, could be litigated in Spain. Because Sakfield has presented no evidence establishing the fact that foreign law will permit such litigation, the doctrine of *forum non conveniens* simply cannot be applied. *See Nemariam v. The Federal Democratic Republic of Ethiopia*, 315 F.3d 390, 394 (D.C. Cir. 2003). Second, although Sakfield may be amenable to process in Spain, there is no showing that the Doe defendants are actually amenable to process there. As discussed above, it is becoming increasingly clear that the individuals behind Sakfield reside in the United States. Were the Court to dismiss in favor of a forum in Spain, it seems likely that Plaintiffs would face the same argument all over again, this time from Doe defendants who prefer to litigate in the United States. *See Avianca v. Corriea*, 1991 WL 496132, at *3 (D.D.C. 1991) (rejecting dismissal in favor of a foreign tribunal where it was not clear that the foreign court could exercise jurisdiction over all defendants). Sakfield's

argument should be seen for what it is – an attempt to bait and switch by persuading this Court to transfer to a forum that will be unable to vindicate Plaintiffs' rights.[7]

Even if, however, Sakfield could show that Spain provides an adequate alternative forum, the balance of public and private interest factors cuts sharply against Sakfield. *See Pain v. United Technologies, Corp.*, 637 F.2d 775, 784-85 (D.C. Cir. 1980). Sakfield verges on misrepresentation when it suggests that the evidence and witnesses in this case are in Spain. One only has to look at Sakfield's own discovery responses to refute this claim. Sakfield produced no documents of its own, in Spanish or English. Indeed, by Sakfield's own admission, no Sakfield employee even participated in preparing Sakfield's answers to interrogatories: all information was provided by "consultants" – all of whom are likely residents of the United States. Sakfield Response to Interrogatory No. 15 (Exhibit 3). Sakfield's ISP is based in the United States and its database of infringing songs was housed in Canada pursuant to a contract Sakfield entered into with a New York company. And the true principals of Sakfield and the PureTunes website are all located in the United States. Griffin Dep. at 32:7-10 (Exhibit 2). While there may be one or two witnesses with relevant information who reside in Spain, the overwhelming portion of discovery will occur in the United States (or in other countries where Sakfield and its corporate web have operated). Transfer to Spain thus will make access to proof more difficult, be more inconvenient to witnesses, will increase the cost to Plaintiffs and witnesses alike, and will result in many of the key parties not being subject to the Court's

---

[7] If this case were tried in Spain, one would expect Sakfield to argue that none of the infringing acts occurred in Spain (because the database of infringing works is not there and the sales were in the United States) and thus that a Spanish court cannot provide a remedy. *Cf. Subafilms*, 24 F. 3d at 1099 (holding that mere domestic authorization of infringing acts occurring abroad does not state a claim under U.S. copyright law because of the presumption against extraterritorial application).

compulsory process. *See Gilbert*, 330 U.S. at 508. Thus, all of the so-called "private factors" counsel against dismissal in favor of a Spanish forum.[8]

There is no doubt that those behind Sakfield purposefully have used companies in far-flung jurisdictions to hide their tracks and escape pursuit. That will pose challenges for both Plaintiffs and the Court as this case moves forward. But that fact does not counsel litigating this case in Spain. Indeed, it is all but certain that all roads lead back to the United States.

Given this background and strong presumption in favor of a plaintiff's choice of forum, there is no basis for dismissing this action in favor of a tribunal in Spain.

---

[8] Because the "private factors" are not near equipoise, the Court need not consider the "public factors" of *forum non conveniens* analysis. But Sakfield's claim to the public interest does not bear close scrutiny. *See Pain*, 637 F.2d at 784-85. Sakfield's claim that Spanish jurors are better situated to hear this case than those in D.C. has no foundation. Nor does its suggestion that this Court should not have to consider questions of Spanish law. A Spanish court hearing this action would have to interpret U.S. copyright law and is thus in exactly the same position. Moreover, once Sakfield's bizarre claim that agreements with artists' rights societies in Spain (who do not own the copyrights to Plaintiffs' sound recordings) gives it the right to sell Plaintiffs' copyrighted works in the United States without a license is dispensed with (as undoubtedly it will be), Spanish law will not be relevant to this action. And, even if it were, this Court is fully equipped to consider questions of foreign law.

## CONCLUSION

For all of these reasons, the Court should authorize jurisdictional discovery for a limited period of time and compel Sakfield to fully cooperate with such discovery. Alternatively, the Court should simply deny Defendants' Motion to Dismiss and require Defendants to answer the complaint. Plaintiffs have provided the Court with two proposed orders reflecting either determination.

Dated: September 16, 2003          Respectfully submitted,

ARISTA RECORDS, INC.; BMG MUSIC; CAPITOL RECORDS, INC.; ELEKTRA ENTERTAINMENT GROUP INC.; FONOVISA RECORDS; INTERSCOPE RECORDS; SONY DISCOS INC.; SONY MUSIC ENTERTAINMENT INC.; UMG RECORDINGS, INC.; VIRGIN RECORDS AMERICA, INC.; WARNER BROS. RECORDS INC.; and ZOMBA RECORDING CORPORATION

Donald B. Verrilli, Jr. (D.C. Bar No. 420454)
Steven B. Fabrizio (D.C. Bar No. 436482)
Thomas J. Perrelli (D.C. Bar No. 438929)
Nicole G. Berner (D.C. Bar No. 472280
JENNER & BLOCK, LLC
601 Thirteenth Street, N.W., Suite 1200 South
Washington, DC  20005-3823
(202) 639-6000

- and -

Matthew J. Oppenheim (D.C. Bar No. 443698)
Recording Industry Association of America, Inc.
1330 Connecticut Avenue, NW, Suite 300
Washington, DC  20036
(202) 775-0101

*Attorneys for Plaintiffs*

# EXHIBIT 1

## OPPOSITION TO DEFENDANT SAKFIELD HOLDING COMPANY S.L.'S MOTION TO DISMISS

**Preston|Gates|Ellis &**
**Rouvelas|Meeds** LLP

Jeff E. Schwartz
Attorney at Law
Jeffschwartz@prestongates.com

August 26, 2003

# PRIVILEGED AND CONFIDENTIAL ATTORNEY/CLIENT COMMUNICATION

## VIA FACSIMILE and Federal Express

Remote Access Co. Ltd.
151 Front Street, West
Suite 706
Toronto, ON
Canada M5J 2N1

Re:     Arista Records, Inc. v. Sakfield Holding Company S.L.,
        No. 03-1474 (RCL) (D.D.C. 2003)

Gentlemen:

We are representing Sakfield Holding Company in the above referenced lawsuit. We understand that the plaintiffs in this case have sought certain information from you, either by means of informal investigation or formal subpoena, or both.

At this time there is no Protective Order in place or agreed to between the parties to this lawsuit. We have informed counsel for Arista et. al that they are not authorized to seek Sakfield's confidential information from any third party, by subpoena, document requests, interrogatories, deposition interrogation, or informal investigation, until they agree with us to an appropriate Protective Order in this case and that order is filed with the Court.

We wanted you to be advised of this situation and also be advised that Sakfield does not authorize you to disclose its confidential information to Arista Records, Inc. or any other party in this case unless and until a Protective Order is in place. Do not disclose Sakfield's confidential information until we have informed you that such an agreement has been reached or until and order compelling you to do so is issued by this Court.

We will advise you when a Protective Order has been filed in the above matter. If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Jeff E. Schwartz

A LAW FIRM  |  A LIMITED LIABILITY PARTNERSHIP INCLUDING OTHER LIMITED LIABILITY ENTITIES

1735 NEW YORK AVENUE NW, SUITE 500  WASHINGTON, DC 20006-5208  TEL: (202) 628-1700  FAX: (202) 331-1024  www.prestongates.com

Anchorage  Coeur d'Alene  Hong Kong  Los Angeles  Orange County  Palo Alto  Portland  San Francisco  Seattle  Spokane  Washington, DC

**Preston|Gates|Ellis &**
**Rouvelas|Meeds** LLP

Jeff E. Schwartz
Attorney at Law
jeffschwartz@prestongates.com

August 26, 2003

## PRIVILEGED AND CONFIDENTIAL ATTORNEY/CLIENT COMMUNICATION

## VIA FACSIMILE and Federal Express

Donald B. Verrilli, Jr.
Steven B. Fabrizio
Thomas J. Perrelli
Jenner & Block LLC
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, D.C. 20005-3823

Re:  Arista Records, Inc. v. Sakfield Holding Company S.L.,
      No. 03-1474 (RCL) (D.D.C. 2003)

Gentlemen:

Be advised that you should not attempt to elicit Sakfield Holding Company confidential information in any of your subpoenas of third parties or in any third party depositions or by means of document requests, interrogatories or less formal means of investigation until an appropriate Protective Order is agreed upon by the parties and in place for this case. Third parties are not authorized to disclose Sakfield's confidential information unless and until an appropriate Protective Order is agreed upon and filed with the Court. If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Jeff E. Schwartz

JES:tth

A LAW FIRM │ A LIMITED LIABILITY PARTNERSHIP INCLUDING OTHER LIMITED LIABILITY ENTITIES

1735 NEW YORK AVENUE NW, SUITE 500  WASHINGTON, DC 20006-5209  TEL (202) 628-1700  FAX (202) 331-1024  www.prestongates.com
Anchorage  Coeur d'Alene  Hong Kong  Los Angeles  Orange County  Palo Alto  Portland  San Francisco  Seattle  Spokane  Washington, DC

# EXHIBIT 2

## OPPOSITION TO DEFENDANT SAKFIELD HOLDING COMPANY S.L.'S MOTION TO DISMISS

0001

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLUMBIA

3       - - - - - - - - - - - - - - - X

4    ARISTA RECORDS, INC., et al.,      :

5                     Plaintiffs,        :

6    v.                                 :  Civil Action No.

7    SAKFIELD HOLDING COMPANY, S.L.,    :    03 1474 RCL

8    a Spanish company d/b/a            :

9    PURETUNES.COM and DOES 1-10,       :

10                    Defendants.        :

11      - - - - - - - - - - - - - - - X

12

13                  Deposition of STEPHEN GRIFFIN

14                       Washington, D.C.

15                  Tuesday, September 9, 2003

16                         9:03 a.m.

17

18    Job No.:  12-22192

19    Pages 1 through 54

20    Reported by:  Cynthia R. Simmons

21

22

23

24

25

0015

1                          STEPHEN GRIFFIN

2          Q.   Mr. Bowles, you said he was your VP of

3     something, was that your VP at Streamcast?

4          A.   At Streamcast, that's correct.

5          Q.   Did Mr. Bowles tell you anything else

6     about his conversation with Mr. Rosso?

7          A.   He did not.

8          Q.   Have you ever used the -- strike that.

9               Throughout the deposition, I'll refer to

10    www.puretunes.com as the Puretunes site, is that

11    okay with you?

12         A.   Uh-huh.

13         Q.   Have you ever used the Puretunes site?

14         A.   I have not.  I have visited the site once

15    it went live.  But as far as subscribing to a

16    monthly or hourly fee and downloading content, I

17    have not.

18         Q.   Are you a direct or indirect owner of the

19    Puretunes site?

20         A.   No, I'm not.

21         Q.   Are you a direct or indirect investor in

22    the Puretunes site or the business that supports

23    it?

24         A.   I am not.

25         Q.   Do you have any formal affiliation with

0016

1                        STEPHEN GRIFFIN

2       the Puretunes site or the Sakfield business?

3           A.   I do not.

4           Q.   Do you have any formal or informal

5       relationship, consulting or otherwise, with

6       Puretunes or Sakfield?

7           A.   I do not.

8           Q.   Do you have --

9           A.   Would you rephrase that last question?  Or

10      would you repeat that?

11               MR. FABRIZIO:   Why don't you repeat it?

12               (The reporter read the record as

13      requested.)

14               THE WITNESS:   I don't think, the answer's

15      still no, but I just want to clarify, is that

16      Puretunes at its launch used Kelly O'Neil for its

17      PR.   Kelly O'Neil was my PR counsel at Streamcast,

18      and she's currently my PR counsel at M-Terra, the

19      current company that I'm CEO of, so I don't think

20      that would qualify, but I think she had a

21      consulting arrangement with Puretunes to do the PR

22      launch.   I just don't want to be misrepresenting

23      because of Ms. O'Neil's involvement with my

24      current company.

25           Q.   So the record's clear, you have a business

1                    STEPHEN GRIFFIN

2    relationship with Ms. O'Neil?

3         A.  That's correct.

4         Q.  And to your understanding, Puretunes or

5    Sakfield has a business relationship with

6    Ms. O'Neil?

7         A.  Had.  It was a short-term, for only

8    launching the site into the market.

9         Q.  But the answer to the question, as to

10   whether you have a business relationship --

11        A.  I do not.

12        Q.  -- with Puretunes or Sakfield, is still

13   no?

14        A.  That's correct.

15        Q.  Do you anticipate any business

16   relationship with Puretunes or Sakfield?

17        A.  I do not.

18        Q.  You mentioned a company called M-Terra?

19        A.  Yes.

20        Q.  Is that your current company?

21        A.  That's my current company.

22        Q.  Can you very generally tell us what it is?

23        A.  Sure.  We are developing peer-to-peer

24   middleware which is going to facilitate developers

25   and scripters and companies being able to access

0018

1                         STEPHEN GRIFFIN

2       all the exciting cost savings of peer-to-peer

3       without having to develop download engines and

4       transfer protocols, et cetera.

5           Q.   Does M-Terra have any ownership interest

6       in Puretunes or Sakfield?

7           A.   We do not.

8           Q.   Any business relationship with Puretunes

9       or Sakfield?

10          A.   We do not.  We, as evidenced by a couple

11      of these e-mails, Mr. Rosso, on behalf of, I

12      believe Puretunes, as we'll potentially get into

13      later, wanted us to provide a billing platform for

14      this new music service, if that's one of the

15      aspects of the technology that M-Terra's going to

16      provide, and a couple of the conversations and all

17      the substantive conversations were centered around

18      that.  So we evaluated providing a payment engine

19      to Puretunes, in just preliminary discussions, and

20      that never went anywhere.

21          Q.   So you have no, M-Terra has no current

22      business arrangement with Puretunes or Sakfield?

23          A.   That's correct.

24          Q.   Or anyone representing them?

25          A.   That's correct.  Right.  And I guess we

0019

1                        STEPHEN GRIFFIN

2       would have to add, because of all these e-mails

3       were sent under Grokster letterhead from

4       Mr. Rosso, most of them at least, so I would

5       include Grokster in that, we would not have any

6       relationship to Grokster either.

7            Q.   We will get to those.   I take it from

8       these e-mails that you have had discussions with

9       people purporting to represent Puretunes or

10      Sakfield?

11           A.   Yes.

12           Q.   Can you describe how many conversations

13      you've had?

14           A.   I have had between three or four

15      conversations.   I would say two were substantive

16      with Mr. Rosso, president of Grokster, who in

17      discussions was representing himself to be one of

18      the owners of Puretunes.

19           Q.   You had three or four conversations.   Were

20      they in person or by telephone?

21           A.   They were only by telephone.   Mr. Rosso

22      was only, I've only met him once in person, and he

23      was at the Streamcast offices in Franklin,

24      approximately two years ago, when he was there

25      with another associate pushing a concept called

0020

```
 1                    STEPHEN GRIFFIN

 2      file freedom, had something to do with

 3      identification of songs on peer-to-peer networks.

 4      We opted not to proceed in that business

 5      direction.

 6              He maintained communications with

 7      Mr. Bowles over the next couple of years and, in

 8      fact, called me early January, I believe it was,

 9      when he was named president of Grokster, to let me

10      know that he was jumping into the fray and battle

11      of peer-to-peer, and I asked him if he lost his

12      mind.  But that would be the only time I met him

13      in person, was approximately two years ago.

14           Q.  What did he say when you asked him if he

15      lost his mind?

16           A.  I believe, and I would just be

17      recollecting, that he just indicated that he

18      thought this was, you know, going to be a big

19      victory, and there was lots of things going on

20      with space, and that he wasn't afraid of the

21      ramifications of lawsuits and stuff to that

22      nature.

23           Q.  Back to your conversations with Mr. Rosso,

24      the three or four conversations you mentioned?

25           A.  Uh-huh.
```

0021

1                           STEPHEN GRIFFIN

2          Q.   They were all by telephone, you said?

3          A.   Yes.

4          Q.   Was anyone else present on the telephone?

5          A.   They were not.

6          Q.   Were those calls recorded in any way, to

7     your knowledge?

8          A.   To my knowledge, they were not.  I can't

9     speak to Mr. Rosso.

10         Q.   When was the first such call?

11         A.   The first really substantive call would

12    have to be around the 20th to the 21st of May.

13         Q.   I noticed you looked at Griffin Exhibit 3

14    in order to date the time of that phone call.  How

15    does Exhibit 3 help you?

16         A.   Well, it's, I sent this to Mr. Cohen on

17    the 22nd, and I recall very clearly that I had the

18    discussion in my M-Terra conference room where I

19    have a white board, and I just was writing notes

20    with a dry eraser marker, and I went back and then

21    later took those notes off the board to summarize

22    the conversation.  Because if we were going to

23    consider working as a payment engine for a

24    company, the last thing I wanted to do was be

25    involved in a lawsuit again.

0026

1                    STEPHEN GRIFFIN

2      A.   100 percent correct.

3      Q.   Okay.

4      A.   I may not have read my handwriting on the

5    marker board very well, but it was clear the

6    discussions with Mr. Rosso, as we were going

7    through this, that it was Grokster and Wayne Rosso

8    that were the same.   And he was describing who

9    those people were.

10     Q.   Okay.   I can represent to you that the

11   principal in Grokster is, who goes by the alias

12   Henry Wilson, is named Daniel Rung, R-u-n-g.   And

13   that his son is named Matthew or Matt Rung,

14   R-u-n-g, and his brother is Michael or Mike Rung.

15     A.   Okay.

16     Q.   Throughout the course of the deposition,

17   I'll refer to them as Rung not Roth.

18     A.   Fine.

19     Q.   Did you ever have any communications with

20   Matthew Rung or Michael Rung?

21     A.   I have not.

22     Q.   E-mail, in person or telephone?

23     A.   None of the above.

24     Q.   Did you execute a nondisclosure agreement

25   with Mr. Rosso regarding the substance of your

0027

1                    STEPHEN GRIFFIN

2      communications?

3           A.  I did not.

4           Q.  Did you have any agreement regarding the

5      confidentiality of your discussions?

6           A.  No, we did not.

7           Q.  Did Mr. Rosso even ask that you treat the

8      information he was providing to you as

9      confidential?

10          A.  I don't recall that he did.

11          Q.  Did you feel that you were under any

12     restrictions as to your disclosure, dissemination

13     of the information he provided you?

14          A.  No, not since Mr. Bowles had already

15     shared with me that much of this same

16     conversation, you know, who the owners of

17     Puretunes really were.  I didn't know that it was

18     privately, you know, protected knowledge.

19          Q.  For the record, we don't believe it is.

20          A.  Yeah.

21              MR. SCHWARTZ:  Objection.

22          Q.  Can you describe for the court the purpose

23     of Mr. Rosso's call to you?

24          A.  Sure.

25          Q.  On or about May 20th or 21st?

1                    STEPHEN GRIFFIN

2              MR. SCHWARTZ:  Objection to form.

3         A.   Mr. Rosso was calling me primarily because

4    of conversations he had had with Trey Bowles, and

5    Trey had updated him as to what Darrell Smith, who

6    was the CTO of Streamcast and my cofounder of

7    M-Terra, what the two of us were up to in our new

8    company, M-Terra.  He had a business issue that he

9    needed to have addressed as it related to a

10   billing platform in a microcommerce level.

11             And by that, I mean songs or information

12   in general, but in this case, songs priced under a

13   dollar.  Credit cards work well at $2 or higher,

14   with a discount fee.  But when you get to small

15   transactions under a dollar, the only one that

16   makes any money is the person that processes the

17   payment.

18             We were working on an application, our

19   first licensee of our middleware was a company out

20   of Canada that was doing a sports wagering

21   application that had already investigated how to

22   make small payments.  It's a company out of

23   England called Payto.net.  And Payto.net was

24   providing the interface for us in our billing for

25   M-Terra, and that was the primary reason that

```
 1                    STEPHEN GRIFFIN
 2      Mr. Rosso called me.  I would say the exclusive
 3      reason.
 4          Q.  He was inquiring about the use of
 5      M-Terra's technology in connection with the
 6      Puretunes site?
 7          A.  Yes.
 8          Q.  Was that billing platform designed for
 9      U.S. dollars?
10          A.  It was designed for, yes, U.S. dollars, as
11      well as all forms of global currency, which was
12      the reason I chose it.
13          Q.  Did Puretunes or Mr. Rosso ever license or
14      acquire the technology from you or M-Terra?
15          A.  It's unknown to me if he acquired it.  He
16      did not acquire it from us.  Subsequently, after
17      the last communication, I was on the phone with
18      the CEO of Payto.net, and much to my surprise, I
19      found that Mr. Rosso was calling Payto.net
20      directly to look for a solution.
21              That kind of soured my desire to work with
22      Puretunes and Mr. Rosso, and I discontinued and
23      did not pursue any additional conversation.  So
24      that leads me to an inconclusive point that I'm
25      not sure if in fact Mr. Rosso and Puretunes ever
```

0030

1                          STEPHEN GRIFFIN

2      did a deal with Payto.net directly.

3          Q.   During either of your conversations, did

4      Mr. Rosso give you any information regarding the

5      ownership of the Puretunes site?

6          A.   We talked at length about that, as

7      outlined in this communication that I summarized

8      on May 22nd.

9          Q.   Griffin Exhibit 3?

10         A.   Yes.

11         Q.   Can you describe for us what Mr. Rosso

12     told you in that regard?

13         A.   Sure.   I mean, I'll try to follow along

14     and get it right.   Mr. Rosso, it was, as I

15     understood how Puretunes operated and having spent

16     the last two and a half years being sued by 29 of

17     the most powerful media companies in the world, I

18     couldn't understand how anyone in their right mind

19     would want to go to a Puretunes business model.

20              And Mr. Rosso explained in great detail

21     how they had set this up and been working on it

22     for almost a year.   And I thought it was actually

23     very clever.   There was some controversy about the

24     laws in Spain, as it related to another company

25     that they were going to work with at Grokster, for

0031

1                          STEPHEN GRIFFIN

2      all you can download for a set fee, and that

3      company, I don't know the name of it, but it had,

4      it eventually had some troubles, and they wouldn't

5      work with the Grokster principals and Mr. Rosso,

6      so they decided to do their own version.

7           Q.   Does the name Weblisten.com ring a bell?

8                MR. SCHWARTZ:   I'm sorry, I'd like to

9      interpose an objection to the response before your

10     question.   I don't mean to slow down your pace.

11     Objection, nonresponsive.

12          A.   It does not.

13          Q.   What did Mr. Rosso tell you about the

14     ownership of Puretunes, the Puretunes site?

15          A.   Well, I'm not sure I got all of it, but he

16     described to me that it was going to be very hard

17     and take a very long time, because of

18     international law, for anyone to ever determine

19     who really owned what.   They had started out with

20     a company that I represented to be Sakfield

21     Holding Company, I believe that's the correct

22     spelling, it's an SA, which is Spain.

23               I didn't know why he had to be SA, but he

24     told me it was an SA.   And then he said, but

25     Sakfield is owned by Chantik Financial Services BV

0032

1                          STEPHEN GRIFFIN

2       in Amsterdam, and he went on to talk about the

3       merchant account is in Holland.  And he explained

4       to me that, by setting up all these different

5       companies, it would take a very long time to

6       determine who really owned what.

7            Q.  Did he say who really owned Puretunes?

8            A.  Well, he represented to me that himself,

9       Daniel Rung, Matt Rung and Michael Rung owned

10      Puretunes, at the end of all the trails.  And we

11      had ongoing discussions about why I should do this

12      kind of structure in the future, since I was tired

13      of being sued by 29 of the most powerful companies

14      in the world.

15           And I represented to him, having been

16      through that, I didn't think there was anything

17      that could stop or slow down 29 of the most

18      powerful companies in the world, and I didn't want

19      to go that direction.

20           MR. SCHWARTZ:  Objection.

21           Q.  Did Mr. Rosso give you any further

22      information about the foreign corporation

23      structure of Puretunes?

24           A.  He did not.

25           Q.  Did he give you any further information as

0033

1                          STEPHEN GRIFFIN

2      to why they had employed the multiple foreign

3      corporation structure?

4           A.   Would you rephrase the question?

5           Q.   Did he tell you why they were using

6      multiple foreign corporations to structure

7      Puretunes rather than, for example, setting up a

8      United States corporation?

9           A.   Well, first and foremost, he believed that

10     in Spain it was legal because of what was going on

11     with the law.  And second, by putting it over

12     there, it made it harder for U.S. jurisdiction and

13     the content owners to come after a company

14     overseas, as referenced by the great difficulty he

15     said that people were having with Kazaa.

16          Q.   Did he give any more description of the

17     difficulties that people were having with Kazaa?

18          A.   He did not.

19          Q.   Other than Sakfield Holding Company SA,

20     and Chantik Financial Services BV, did Mr. Rosso

21     identify any other foreign companies involved in

22     the ownership structure of Puretunes?

23          A.   Not to me.

24          Q.   To be clear for the record, did he state

25     to you explicitly that part of the reason for

```
 1                    STEPHEN GRIFFIN
 2    using the foreign companies was to hide the
 3    involvement of Mr. Rosso and the Rungs?
 4        A.   Yes.
 5        Q.   Did you have any discussion as to how he
 6    came to choose which countries they set up these
 7    foreign shell corporations?
 8        A.   We did.
 9        Q.   What did he say in that regard?
10        A.   Well, as I indicated previously, the
11    Sakfield in Spain was the first one because of
12    this other company that was already in Spain that
13    was doing something very similar, but they
14    couldn't work out business deals with, so it had
15    to start there.  Amsterdam, because of the Kazaa
16    stuff that had taken place in the ongoing lawsuit
17    with file sharing, was the next place.  And then
18    from there, he had looked at, you know, the
19    British Virgin Islands and Switzerland.
20             We had a interesting conversation why
21    Switzerland could be a good home because of taxes,
22    and you're not taxed quite as much in Switzerland
23    as for U.S. corporate taxes, so there had been a
24    great deal of research, that was quite impressive
25    to me, that he had done with the help of someone
```

```
1                        STEPHEN GRIFFIN
2     to set this whole thing up.  It obviously wasn't
3     done quickly.
4          Q.   Did he discuss any companies in Bermuda?
5          A.   We discussed Bermuda.  We discussed
6     Bermuda, and I'm not sure if it was a personal
7     ownership by Mr. Rosso or the Rungs or someone
8     that would end up owning something.  It would be
9     speculation.  But not by name any companies, just,
10    I remember Bermuda was one of the companies that
11    was friendly to the strategy.
12             MR. COHEN:  Just for clarification, you
13    said, "one of the companies that was friendly to
14    the strategy."
15             THE WITNESS:  Countries.
16             MR. COHEN:  Countries.
17    BY MR. FABRIZIO:
18         Q.   And in your answer, the strategy referring
19    there is the strategy of trying to conceal their
20    involvement?
21         A.   No, I would not say, characterize that.  I
22    would say I would characterize that the strategy
23    of financial advantage to a U.S. citizen in an
24    ownership in a foreign country.  It had nothing to
25    do with the other.
```

0036

1                        STEPHEN GRIFFIN

2        Q.   Your conversation about Bermuda?

3        A.   Right.

4        Q.   Okay.   Did he mention any companies in a

5   country called Curacao, which I always get wrong,

6   C-u-r-a-c-a-o?

7        A.   I don't recall specifically.

8        Q.   Okay.   So there's no ambiguity in the

9   record, Mr. Rosso told you in no uncertain terms

10  that he, Daniel Rung, Matthew Rung and Michael

11  Rung were the ultimate owners of the Puretunes

12  site, is that correct?

13       A.   Yes.

14            MR. SCHWARTZ:   Objection to the form of

15  the question.

16       A.   Yes, it is.

17       Q.   Do you have any other information

18  concerning the ownership or operation of the

19  Puretunes site, other than what you've already

20  told us?

21       A.   The ownership and operation?

22       Q.   Or operation?

23       A.   Well, as reflected in my summary, I was

24  quite impressed that they were already generating

25  revenues so quickly.   I think that it was

0037

1                    STEPHEN GRIFFIN

2       interesting, and that was the basis, the other

3       stuff, I didn't think was as important.  But the

4       third paragraph is what was quite interesting to

5       me, as a businessman, that he was quite detailed

6       on their revenue generation, and it had not been

7       launched on Grokster yet.

8               This was just word of mouth, I guess, or

9       the PR blitz that Ms. O'Neil had done.  And he

10      knew pretty much that 60 percent of the sales were

11      for what he referred to as the "eight hour," I

12      guess you could pay X dollars for eight hours of

13      downloading, and 40 percent was for the monthly

14      model, and really, the basis of our discussion to

15      start selling singles was that he had allocated 12

16      percent of his revenues, or they had, for payments

17      to the rights' holders in Spain, based on what the

18      law outlined.

19              And they had changed their mind on what

20      that meant, so they were going to have to go to

21      selling singles versus an all-you-can-download

22      model, which is why they needed a payment

23      platform.  He also indicated they were setting

24      aside five percent of revenues to pay the labels.

25          Q.  You're referring to Griffin Exhibit 3, the

0038

```
1                         STEPHEN GRIFFIN
2       third paragraph that begins, "They are generating
3       $5,000 a day and have not launched on Grokster
4       yet," correct?
5            A.  Yes.
6            Q.  Mr. Rosso indicated that Puretunes already
7       had paying subscribers?
8            A.  Oh, yeah, had to with this kind of data.
9       I mean, I don't know.
10           Q.  Did he give you any further information
11      about the revenues or the nature of their
12      subscribers?
13           A.  He did not.
14           Q.  Ms. O'Neil, what is the name of
15      Ms. O'Neil's company?
16           A.  O'Neil Communications.
17           Q.  And where are they located?
18           A.  San Jose area, it's a 408 area code, so it
19      would be in that general vicinity.
20           Q.  And you understood that Ms. O'Neil and
21      O'Neil Communications were representing or
22      performing PR services for Mr. Rosso and
23      Puretunes?
24                MR. SCHWARTZ:  Objection.
25                MR. COHEN:  And did you say PR services?
```

0039

1                    STEPHEN GRIFFIN

2          MR. FABRIZIO:  Public relations.

3          THE WITNESS:  She was providing PR support

4     for the launch of Puretunes.  I'm not sure who she

5     was dealing with.

6     BY MR. FABRIZIO:

7          Q.   And how do you know that?

8          A.   She told me.

9          Q.   When did she tell you?

10         A.   Prior to the launch of Puretunes.  I don't

11    recall the exact date that Puretunes launched.  We

12    had a phone conversation that just reflected that

13    she was going to be involved in that.

14         Q.   Did she give any indication as to her

15    target audience for the Puretunes public relations

16    campaign?

17         A.   No, she didn't.  I mean, it would have to

18    be in the United States because she doesn't

19    specialize outside the U.S.  But I don't know,

20    you'd have to ask her.

21         Q.   At the heart of the Puretunes site is a

22    database of recordings that people can access

23    through the site.  Do you have any information

24    regarding the location of that database of music

25    files?

0047

1                       STEPHEN GRIFFIN

2          A.   I do.

3          Q.   Do you have any understanding about

4     individuals dealing in certain currencies over the

5     internet?

6               MR. FABRIZIO:  Objection, vague.

7          A.   I do not.

8          Q.   Okay.

9               MR. SCHWARTZ:  I don't have any more

10    questions.

11              MR. FABRIZIO:  I have nothing further.

12              (Off the record.)

13              MR. FABRIZIO:  We can go on the record, if

14    you want to put this on the record, we expressly

15    do not have an agreement.  I saw that you made

16    that request of my partner, Ms. Borrelli, and we

17    said no.

18              MR. SCHWARTZ:  Actually, the response I

19    got back from your partner was that, until we had

20    a resolution on the protective order, this was

21    going to be treated confidential, as opposed to

22    what we asked for, which was that it be outside

23    attorney's eyes only.

24              MR. FABRIZIO:  What I thought was we would

25    see how the deposition went, and if anything that

1                      STEPHEN GRIFFIN

2      was conceivably confidential came up, we would

3      then consider whether we would treat it as

4      confidential pursuant to the protective order we

5      proposed.  But given the testimony today and given

6      the nature of the testimony, it's not conceivable

7      that any of this would be considered confidential

8      as to Sakfield.

9              MR. SCHWARTZ:  Obviously, Sakfield takes

10     issue with that, but partly, it has to do with the

11     fact that, in Spain, all telephonic communications

12     are considered secret.  And so to the extent that

13     you are going to take the position that anything

14     that Mr. Rosso said has anything to do with

15     Sakfield, then obviously, the constitution of

16     Spain protects those communications.  But if

17     you're not going to attribute those communications

18     to Sakfield, then you can treat it however you

19     like.

20             MR. FABRIZIO:  We have every intention to

21     attribute those communications to Sakfield.  And

22     if you'd like, we can agree to give you a couple

23     of days to move for a protective order, but short

24     of that, we don't believe that the constitution of

25     Spain governs a communication between Mr. Griffin

```
1                       STEPHEN GRIFFIN
2         in Tennessee and Mr. Rosso in Arlington, Virginia,
3         unless you want to represent he was in Spain at
4         the time.
5                   MR. SCHWARTZ:  I have no idea where
6         Mr. Rosso is, and I'm not under oath.
7                   MR. FABRIZIO:  So anyway, if you want, you
8         can send me a letter, and we'll give you a period
9         of time where we will treat it as confidential, as
10        we said, in order for you, if you represent that
11        you're making a motion for protective order.
12                  MR. SCHWARTZ:  So for the time being,
13        you're going to treat it as confidential until we
14        resolve whether or not there's going to be a
15        motion?
16                  MR. FABRIZIO:  If you want to send me a
17        letter telling me today that you intend to make a
18        motion, we will give you a period of time to make
19        that motion, if you represent you're planning on
20        making it.  But we obviously have to make use of
21        this information.
22                  MR. COHEN:  Let me clarify for the record,
23        regardless of the position of the parties on this
24        issue, that Mr. Griffin is here pursuant to the
25        subpoena that was introduced into evidence and has
```

# EXHIBIT 3

**OPPOSITION TO DEFENDANT SAKFIELD
HOLDING COMPANY S.L.'S MOTION TO DISMISS**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARISTA RECORDS, INC., et al.   ) | |
| ) | |
| Plaintiffs,   ) | |
| ) | |
| v.   ) | Civil Action No. 03-1474 (RCL) |
| ) | |
| SAKFIELD HOLDING COMPANY   ) | |
| S.L., et al.   ) | |
| ) | |
| Defendants.   ) | |
| ) | |

## DEFENDANT SAKFIELD HOLDING COMPANY S.L.'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant Sakfield Holding Company S.L. ("Sakfield"), in accordance with Rule 33 of the Federal Rules of Civil Procedure, hereby serves these objections and responses to Plaintiffs' ("Arista") First Set of Interrogatories:

Sakfield makes the following general response, objections and reservations of rights, whether or not separately set forth in response to each Interrogatory, to each and every instruction, definition, and document request made in the Interrogatories:

1.      Sakfield reserves the right to supplement, alter or amend their response to Plaintiffs' Interrogatories to the extent that additional or different information becomes available through discovery or further investigation. Sakfield reserves the right to make any use of, or to introduce at any hearing and at trial, information and/or documents responsive to Plaintiffs' Interrogatories but discovered subsequent to the date of this response, including but not limited to any such information or documents obtained in discovery herein.

2.      Sakfield reserves all objections or other questions as to the competency, relevance, materiality, privilege or admissibility of any document or thing produced in response to the Interrogatories as evidence in any subsequent proceeding or trial in this or any other action for any purpose whatsoever.

3.      Sakfield reserves the right to object on any ground at any time to such other or supplemental Interrogatories as Plaintiffs may propound involving or relating to the subject matter of the Interrogatories.

4.      Sakfield objects to the extent that any Interrogatory consists of or otherwise includes subparts that should have been presented as one or more separate interrogatories in accordance with the Local Rule of this Court.

5       Sakfield objects to the definitions of "all documents," "identity," identify," identification," "specify," "specifying," describe" and "description" to the extent that they call for information not required by, or beyond the scope of, the Federal Rules of Civil Procedure or the Local Rules of this Court and seek information or documents not in the possession, custody or control of Sakfield.

2

6.      Sakfield objects to each and every "Definition and Instruction" to the extent that it is vague, unduly burdensome and/or seeks information or other response that is not required by, or beyond the scope of, the Federal Rules of Civil Procedure, particularly Rule 33.

7.      Sakfield incorporates, as if fully set forth herein, the general objections and objections to Definitions set forth in its Responses to Plaintiff's Requests for Production of Documents served August 1, 2003.

8.      Sakfield objects to each of the Interrogatories insofar as they seek production of documents or information protected by the attorney-client privilege or the work product doctrine, the joint defense privilege, or any other privilege or protection.  Any inadvertent production of such privileged or protected documents or information shall not be deemed a waiver of any privilege or protection with respect to such documents or information.

9.      Any responses or documents produced or identified by Sakfield in response to any Interrogatory shall in no way constitute or be construed as a waiver of any objections contained herein.

Sakfield hereby incorporates each of these General Responses and Objections into the specific objections and responses set forth below, whether or not express reference is made to the General Responses or Objections in those specific objections and responses.

## OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

Subject to and without waiver of the foregoing, Sakfield makes the following specific objections and responses to the Interrogatories:

INTERROGATORY NO. 1:  Identify all persons who own, control, benefit from and/or are involved with (or have in the past owned, controlled, benefited from or been involved with) Sakfield Holding Company S.L. and/or the PureTunes Site, including, for example, all investors, principals, shareholders, directors, officers, parents or subsidiaries.  Include

3

in your Response the nature of each person's ownership, involvement and/or control,
and/or how that person benefits from Sakfield Holding Company S.L. and/or the
PureTunes Site. For any entity that is identified, identify any and all individuals, entities,
or corporations that own, control, benefit from and/or are involved with such entity, and
for each such entity further identified, provide the same information. This response
should include any and all persons who own, control, benefit from and/or are involved
with Sakfield Holding Company S.L. and/or the PureTunes Site directly or indirectly,
such as through a chain of corporate or other entities, and should include the identity of
the corporation or natural person or persons who ultimately own, control, benefit from
and/or are involved with Sakfield Holding Company S.L. and/or the PureTunes Site.

RESPONSE:

Sakfield objects to this Interrogatory to the extent that it seeks information or production
of documents protected by the attorney-client privilege or the work product doctrine.
Sakfield also objects to this Interrogatory on the grounds that the terms – "control",
"benefit from," and "involvement," are over broad, unduly burdensome, and call for
irrelevant information, and thus, the Interrogatory is not reasonably calculated to lead to
the discovery of admissible evidence.
Subject to the foregoing, Sakfield responds as follows: Sakfield owns PureTunes.com.
Sakfield is owned by Chantik Financing Services BV. Barbara Ingenbleek was
contracted by Sakfield, via Famara Management S.L., to manage Sakfield. Chantik is
owned by Dean Properties.

INTERROGATORY NO. 2: Describe in detail the role of the following individuals or
entities in the establishment, control and/or operation of, or involvement with, the
PureTunes Site:

        a.    Wayne Rosso

b.      Projektorsteuer-Software, Ltd.

c.      Cogent Communications, Inc.

d.      Daniel Rung (AKA Henry Wilson)

e.      Matthew Rung (AKA Jim Winston)

f.      Michael Rung

g.      Grokster Ltd.

h.      Swaptor Inc.

i.      Hendrika Helena Ingenbleek Barbara Petronella

j.      Alejandra Anaya Lopez

k.      Marta Lopez Martinez

l.      Susana Menendez Herrero

m.      Mario Pestana Sartorius

n.      Francisco Javier Siguenza Hernandez

o.      Juan Vila Coro Clot

p.      Famara Management S.L.

q.      RACO Remote Access Company Limited

r.      Bibit Payment Services

    s.      any other company providing telecommunications, web hosting, Internet access, micro-payment services or any other similar services for use with the PureTunes Site.

    t.      Chantik Financing Services BV

    u.      Dean Properties

    v.      NCS Managers BV

    w.      NCS Benelux

    x.      MTM group

<u>RESPONSE</u>:

Sakfield objects to this Interrogatory to the extent that it seeks information or production of documents protected by the attorney-client privilege or the work product doctrine.

Sakfield also objects to this Interrogatory on the grounds that the terms – "role," "establishment," "involvement," "micro-payment," and "similar services," are over broad, unduly burdensome, and call for irrelevant information, and thus, this Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing, Sakfield responds respond as follows

    a.      Wayne Rosso  -  Grokster employee

    b.      Projektorsteuer-Software, Ltd.  -  confidential

    c.      Cogent Communications, Inc.  -  none

    d.      Daniel Rung (AKA Henry Wilson)  -  independent consultant to

Sakfield

e.    Matthew Rung (AKA Jim Winston)  -  independent consultant to Sakfield

f.    Michael Rung  -  independent consultant to Sakfield

g.    Grokster Ltd.  -  party to Sakfield distribution agreement

h.    Swaptor Inc. - none

i.    Hendrika Helena Ingenbleek Barbara Petronella  -  see response to Interrogatory 1

j.    Alejandra Anaya Lopez  - Siguenza & Vilacoro Abogados, S.L., employee

k.    Marta Lopez Martinez  - Siguenza & Vilacoro Abogados, S.L., employee

l.    Susana Menendez Herrero  - Siguenza & Vilacoro Abogados, S.L., employee

m.    Mario Pestana Sartorius  -  independent accountant to Sakfield

n.    Francisco Javier Siguenza Hernandez  -  Siguenza & Vilacoro Abogados, S.L., employee

o.    Juan Vila Coro Clot  -  not known

p.    Famara Management S.L.  -  management services contractor

7

q.      RACO Remote Access Company Limited  -  operations center contractor

r.      Bibit Payment Services  -  payment services contractor

s.      any other company providing telecommunications, web hosting, Internet access, micro-payment services or any other similar services for use with the PureTunes Site.  -  none

t.      Chantik Financing Services BV  -  see response to Interrogatory 1

u.      Dean Properties  -  see response to Interrogatory 1

v.      NCS Managers BV  -  not known

w.      NCS Benelux  -  not known

x.      MTM group  -  not known

INTERROGATORY NO. 3: Describe in detail each and every communication between Sakfield Holding Company S.L. and/or those who own, control, or operate the PureTunes Site with the individuals and entities listed in Interrogatory No. 2.

RESPONSE:

Sakfield objects to this Interrogatory as grossly over broad, unduly burdensome, calling for irrelevant information and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing, Sakfield responds respond as follows:

Please refer to the answers in Interrogatories 1 and 2 and to responses to requests for production

8

INTERROGATORY NO. 4:  Describe in detail the relationship between Sakfield Holding Company S.L. and/or the PureTunes Site, and Grokster Ltd., including, but not limited to,

a.      any financial partnership between Grokster Ltd. and Sakfield Holding Company S.L. and/or the PureTunes Site of any kind, including a description of how such partnership began;

b.      any payments made to or from Grokster Ltd. to Sakfield Holding Company S.L. or any of the companies in its corporate family, including an explanation of the purpose of such payment;

c.      any attempts to make the software application for the PureTunes Site available via the Grokster Ltd. website, including financial arrangements involved in making such software available.

In describing this relationship, the response should identify any and all individuals involved in the relationship at both Grokster Ltd. and Sakfield Holding Company S.L. and/or the Puretunes Site, and explain the role that each individual played therein.

RESPONSE:

Grokster distribution agreement defines relationship; no payments made

INTERROGATORY NO. 5: Describe in detail the relationship between Sakfield Holding Company S.L. and/or the PureTunes Site, and Swaptor Inc., including, but not limited to,

    a.    any financial partnership between Swaptor Inc. and Sakfield Holding Company S.L. and/or the PureTunes Site of any kind, including a description of how such partnership began;

    b.    any payments made to or from Swaptor Inc. to Sakfield Holding Company S.L. or any of the companies in its corporate family, including an explanation of the purpose of such payment;

    c.    any attempts to make the software application for the PureTunes Site available via the Swaptor Inc. website, including financial arrangements involved in making such software available.

In describing this relationship, the response should identify any and all individuals involved in the relationship at both Swaptor Inc. and Sakfield Holding Company S.L. and/or the Puretunes Site, and explain the role that each individual played therein.

RESPONSE:

Sakfield has no relationship with Swaptor.

INTERROGATORY NO. 6: Describe in detail the source and location of the database or databases of digital music files, or any files that comprise such database or databases, that were used, or were intended for use, to offer to the public the Recorded Works via the PureTunes Site.

RESPONSE:

WebListen.com and Allofmp3.com (physical database locations not known).

INTERROGATORY NO. 7:  Identify all persons who have been responsible for or have been involved in uploading, obtaining, copying, and disseminating any of the digital music files that comprise the database or databases that were used to offer the Recorded Works to the public via the PureTunes Site.

RESPONSE:

Third party consultants; refer to responses to Interrogatory No. 2.

INTERROGATORY NO. 8:  Identify the source of and the location of all digital copies of the Recorded Works and artwork displaying album covers, whether they formed part of the database that was offered to the public via the PureTunes Site or not.

RESPONSE:

Refer to responses to Interrogatory Nos. 6 and 7.

INTERROGATORY NO. 9:  Identify all persons involved in the Creation of the software used for the PureTunes Site and those who maintained such software and the PureTunes Site.  For each person identified, identify the role that such person played in creating and/or maintaining the software and/or system use for the PureTunes Site.

11

RESPONSE:

Third party software developers, third party consultants; refer to responses to Interrogatory No. 2.

INTERROGATORY NO. 10: Identify all persons who have acted as employees, advisors or consultants, whether formal or informal, or who provided any assistance whatsoever, whether technical, financial, organizational, managerial or other, to Sakfield Holding Company S.L. and/or the PureTunes Site. For each such person, identify the role the person played and any office held.

RESPONSE:

Third party consultants; refer to responses to Interrogatory No. 2.

INTERROGATORY NO. 11: Describe in detail the payment schedule for any payments, profit sharing, shareholder dividend payouts, and/or bonuses paid to officers, board members, consultants, or advisors by Sakfield Holding Company S.L. and/or the PureTunes Site.

RESPONSE:

Sakfield objects to this Interrogatory on the grounds that the terms "payment" and "payment schedule" are vague and ambiguous.

Subject to the foregoing, Sakfield responds respond as follows: No payment schedule exists.

12

INTERROGATORY NO. 12:  Describe in detail the communications between Sakfield Holding Company S.L., and any clients or customers of the PureTunes Site.  Identify those employees or officers who participated in these communications.

RESPONSE:

Sakfield objects to this Interrogatory as over broad, unduly burdensome, calling for irrelevant information and not reasonably calculated to lead to the discovery of admissible evidence insofar as it relates to events in foreign countries.
Subject to the foregoing, Sakfield responds as follows:
Sakfield or its employees have not communicated with clients or customers of the PureTunes site.

INTERROGATORY NO. 13:  State the reasons for the decision to disable access to the PureTunes Site by the public.  Identify any and all persons or individuals involved in making such decision and, for each such person, identify their role in making such decision.

RESPONSE:

Sakfield objects to this Interrogatory to the extent that it seeks information or production of documents protected by the attorney-client privilege or the work product doctrine.

Subject to the foregoing, Sakfield responds as follows: the site was disabled by Sakfield management to mitigate alleged harm.

13

INTERROGATORY NO. 14:  Describe in detail any and all future plans for the PureTunes Site and the database of Recorded Works, and any copies of the Recorded Works, including the persons involved in and/or responsible for the making of such plans.

RESPONSE:

Sakfield objects to this Interrogatory to the extent that it seeks information or production of documents protected by the attorney-client privilege or the work product doctrine. Subject to the foregoing, Sakfield responds as follows: Sakfield has no future plans.

INTERROGATORY NO. 15:  Identify all persons contributing to, drafting, reviewing, or having information relevant to, the answers to these interrogatories.

RESPONSE:

Sakfield objects to this Interrogatory to the extent that it seeks information or production of documents protected by the attorney-client privilege or the work product doctrine. Subject to the foregoing, Sakfield responds as follows: consultants for Sakfield contributed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing answers to Defendant's First Set of Interrogatories are true and correct to the best of my knowledge and belief.

Executed this _____ day of September 2003 in Madrid, Spain.

_____

Barbara Ingenbleek

14

As to objections only:

Lawrence M. Sung (DC Bar No. 442021)
Jeff E. Schwartz (DC Bar No. 442804)
PRESTON GATES ELLIS &
ROUVELAS MEEDS LLP
1735 New York Avenue, NW, Suite 500
Washington, DC 20006-5209
(202) 628-1700

15

## CERTIFICATE OF SERVICE

I hereby certify that this 3rd day of September 2003, the foregoing DEFENDANT SAKFIELD HOLDING COMPANY S.L.'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES were served, via email and Federal Express, on:

> Thomas J. Perrelli
> Jenner & Block LLC
> 601 Thirteenth Street, NW
> Suite 1200 South
> Washington DC  20005-3823
> tperrelli@jenner.com

Lawrence M. Sung
PRESTON GATES ELLIS &
ROUVELAS MEEDS LLP
1735 New York Avenue, NW
Suite 500
Washington, DC  20006-5209

# EXHIBIT 4

**OPPOSITION TO DEFENDANT SAKFIELD
HOLDING COMPANY S.L.'S MOTION TO DISMISS**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ARISTA RECORDS, INC.,** *et al.* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 03-1474 (RCL)** |
| | ) | |
| **SAKFIELD HOLDING COMPANY** | ) | |
| **S.L.,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANT SAKFIELD HOLDING COMPANY S.L.'S RESPONSES TO PLAINTIFFS' FIRST REQUEST FOR DOCUMENTS

Defendant Sakfield Holding Company S.L. ("Sakfield"), in accordance with Rule 34 of the Federal Rules of Civil Procedure, hereby serves these objections and responses to Plaintiffs' ("Arista") First Request for Documents:

## GENERAL STATEMENT

1.      Sakfield's responses to Arista's requests are made to the best of the present knowledge, information, and belief of Sakfield and its counsel.  These responses are subject to additional or different information that discovery or further investigation may disclose and reflects only the current status of Sakfield's knowledge and belief regarding the subject matter of the requests to which Sakfield responds.

2.      Sakfield will respond to each request by producing materials currently in Sakfield's possession, custody, or control.  By stating in these responses that Sakfield will produce materials or is searching for materials, Sakfield does not represent that any materials actually exist, but rather that Sakfield will make a good faith search and attempt to ascertain whether materials responsive to Arista's requests do in fact exist.

3.      Regarding this response and any materials produced as a result of Arista's requests, Sakfield reserves all objections as to the authenticity, relevancy, materiality, privilege, or admissibility as evidence in any subsequent proceeding or trial of this or any other action.

## GENERAL OBJECTIONS

In addition to the specific responses to each request below, Sakfield makes certain general objections to the requests for production of documents. The failure to include any general or specific objection to a request is neither intended as, nor in any way shall be deemed, a waiver of Sakfield's right to assert that or any other objection at a later date.

1.  Sakfield objects to Arista's request to the extent they seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this matter.

2.  Sakfield objects to Arista's request to the extent they seek information protected by the attorney-client privilege or work-product immunity, or which are otherwise exempted from discovery. Any inadvertent production shall not be deemed a waiver of any privilege with respect to such documents or information, or of any work-product immunity, which may attach thereto.

3.  Sakfield objects to Arista's request to the extent they seek discovery of proprietary and/or confidential information (including, but not limited to, confidential technical and financial information), except pursuant to the terms of an agreed-upon protective order, which the parties are currently negotiating.

4.  Sakfield objects to these requested materials to the extent they require Sakfield to take actions outside the scope of the FEDERAL RULES OF CIVIL PROCEDURE or LOCAL RULES of this Court.

## SPECIFIC OBJECTIONS AND RESPONSES

### DOCUMENT REQUEST NO. 1:

All documents reviewed, relied upon, referenced or otherwise consulted in preparing your responses to plaintiffs' First Set of Interrogatories to Defendant Sakfield Holding Company S.L and to these document requests.

### RESPONSE TO REQUEST NO. 1:

Sakfield objects to this request as overly broad and unduly burdensome. As written, the request seeks documents such as the LOCAL RULES of this Court, which were consulted in

preparing Sakfield's responses to these requests.  For these same reasons, Sakfield also objects to this request because it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this case.

Subject to the foregoing general and specific objections and limitations and without waiver thereof, Sakfield will produce all non-privileged, responsive documents to the extent they can be located after a reasonable search.

## DOCUMENT REQUEST NO. 2:

All documents pertaining to the ownership and/or control of any of the entities or services listed below.  Such documents should include, but not be limited to, documents showing the identities of parent corporations, subsidiaries, owners, investors, shareholders, directors, board members, or beneficiaries of any of these companies, even where such ownership, investment, or benefit is direct or indirect, e.g., where ownership is held or benefit obtained through one or more parent or other corporations or entities in a chain of corporations.  The entities or services to which this question pertains include:

      a.     Sakfield Holding Company S.L.

      b.     the PureTunes Site

      c.     Chantik Financing Services BV

      d.     Dean Properties

      e.     NCS Managers BV

      f.     NCS Benelux

      g.     MTM group

      h.     Famara Management S.L.

      i.     Projektorsteuer-Software, Ltd.

## RESPONSE TO REQUEST NO. 2:

Sakfield objects to this Request to the extent it seeks materials not currently in Sakfield's possession, custody or control, or are more readily available from third parties to this case.

Subject to the foregoing general and specific objections and limitations and without waiver thereof, Sakfield will produce all non-privileged, responsive documents to the extent they can be located after a reasonable search.

**DOCUMENT REQUEST NO. 3:**

All documents pertaining to corporate decisions of Sakfield Holding Company S.L. involving the PureTunes Site, including internal letters, memoranda, or electronic mail correspondence, resolutions of the board of directors, minutes of meetings, meeting agendas, presentations made to board members, and presentations made by corporate officers.

**RESPONSE TO REQUEST NO. 3:**

Subject to the foregoing general objections and limitations and without waiver thereof, Sakfield will produce all non-privileged, responsive documents to the extent they can be located after a reasonable search.

**DOCUMENT REQUEST NO. 4:**

All documents relating to the establishment, financing, management, operation, maintenance and/or discontinuation of the PureTunes Site, including, but not limited to, documents

        a.    indicating the individuals or entities who created the PureTunes software;

        b.    indicating those who maintained such software and the PureTunes system;

        c.    indicating the source(s) of and/or the location of any and all digital copies

of the Recorded Works and artwork displaying album covers, whether they formed part of the database that was offered to the public via the PureTunes Site or not.

**RESPONSE TO REQUEST NO. 4:**

Sakfield objects to this Request on the basis that the terms "PureTunes software" and "PureTunes system" are undefined and, therefore, vague and ambiguous.

Subject to the foregoing general objections and limitations and without waiver thereof

4

and using Sakfield's good faith interpretation of the terms "PureTunes software" and "PureTunes system," Sakfield will produce all non-privileged, responsive documents to the extent they can be located after a reasonable search.

## DOCUMENT REQUEST NO. 5:

All documents relating to any communications, including contracts, correspondence, agreements, memos, telephone records, electronic mail, remittances, and bills, with

        a.     Cogent Communications, Inc.;

        b.     RACO - Remote Access Company Ltd.;

        c.     Bibit Payment Services, and/or any other micro-payment service;

        d.     Projektorsteuer-Software, Ltd.; and

        e.     any other company providing telecommunications, web hosting, Interact

access, software, or any other similar services for use with the PureTunes Site.

## RESPONSE TO REQUEST NO. 5:

Sakfield objects to this Request to the extent it seeks materials not currently in Sakfield's possession, custody or control, or are more readily available from third parties to this case.

Subject to the foregoing general and specific objections and limitations and without waiver thereof, Sakfield will produce all non-privileged, responsive documents to the extent they can be located after a reasonable search.

## DOCUMENT REQUEST NO. 6:

All documents pertaining to the involvement of any of the following individuals with any aspect of Sakfield Holding Company S.L., the PureTunes Site, or any of the entities listed in Document Request No. 2:

        a.     Daniel Rung (AKA Henry Wilson)

        b.     Matthew Rung (AKA Jim Winston)

c.     Michael Rung

d.     Wayne Rosso

e.     Hendrika Helena Ingenbleek Barbara Petronella

f.     Alejandra Anaya Lopez

g.     Marta Lopez Martinez

h.     Susana Menendez Herrero

i.     Maria Pestana Sartorius

j.     Francisco Javier Siguenza Hernandez

k.     Juan Vila Core Clot

## RESPONSE TO REQUEST NO. 6:

Sakfield objects to this Request to the extent it seeks materials not currently in Sakfield's possession, custody or control, or are more readily available from third parties to this case.

Subject to the foregoing general and specific objections and limitations and without waiver thereof, Sakfield will produce all non-privileged, responsive documents to the extent they can be located after a reasonable search.

## DOCUMENT REQUEST NO. 7:

All documents pertaining to the involvement of Grokster Ltd. with Sakfield Holding Company S.L. or the PureTunes Site, including, but not limited to, documents pertaining to any financial partnership between Grokster Ltd. and Sakfield Holding Company S.L. or the PureTunes Site, documents pertaining to any payments made to or from Grokster Ltd. by Sakfield Holding Company S.L. or any of the companies in its corporate family, any correspondence between Grokster Ltd. and Sakfield Holding Company S.L. regarding the PureTunes Site, and documents pertaining to Grokster Ltd.'s making available the PureTunes software application from its website.

**RESPONSE TO REQUEST NO. 7**:

Sakfield objects to this Request to the extent it seeks materials not currently in Sakfield's possession, custody or control, or are more readily available from third parties to this case.

Subject to the foregoing general and specific objections and limitations and without waiver thereof, Sakfield will produce all non-privileged, responsive documents to the extent they can be located after a reasonable search.

**DOCUMENT REQUEST NO. 8**:

All documents pertaining to the involvement of Swaptor Inc. with Sakfield Holding Company S.L. or the PureTunes Site, including, but not limited to, documents pertaining to any financial partnership between Swaptor Inc. and Sakfield Holding Company S.L. or the PureTunes Site, documents pertaining to any payments made to or from Swaptor Inc. by Sakfield Holding Company S.L. or any of the companies in its corporate family, and any correspondence between Swaptor Inc. and Sakfield Holding Company S.L. regarding the PureTunes Site.

**RESPONSE TO REQUEST NO. 8**:

Sakfield does not have any documents responsive to this request.

**DOCUMENT REQUEST NO. 9**:

All documents pertaining to the source, establishment, operation, status and/or location(s) of the database and/or any files that formed part of the database that was being used, or was intended for us, to offer the Recorded Works to the public via the PureTunes Site, whether they formed part of the database that was offered to the public via the PureTunes Site or not.

**RESPONSE TO REQUEST NO. 9**:

Subject to the foregoing general objections and limitations and without waiver thereof, Sakfield will produce all non-privileged, responsive documents to the extent they can be located after a reasonable search.

7

**DOCUMENT REQUEST NO. 10**:

All documents relating to the solicitation of investments or the existing investments in Sakfield Holding Company S.L. and/or the PureTunes Site, including any presentations to potential investors.

**RESPONSE TO REQUEST NO. 10**:

Sakfield does not have any documents responsive to this request.

**DOCUMENT REQUEST NO. 11**:

All documents relating to communications with customers of Sakfield Holding Company S.L. and/or the PureTunes Site.

**RESPONSE TO REQUEST NO. 11**:

Sakfield does not have any documents responsive to this request.

**DOCUMENT REQUEST NO. 12**:

All documents relating to disabling access to the PureTunes Site and making it unavailable to the public, whether permanently or temporarily, including, but not limited to, documents reflecting the decision to stop access to the website from the Internet and documents reflecting instructions concerning disabling such access.

**RESPONSE TO REQUEST NO. 12**:

Subject to the foregoing general objections and limitations and without waiver thereof, Sakfield will produce all non-privileged, responsive documents to the extent they can be located after a reasonable search.

**DOCUMENT REQUEST NO. 13**:

A copy of all of the pages that were made available to the public, or were intended to be made available to the public, on the PureTunes Site.

**RESPONSE TO REQUEST NO. 13**:

Sakfield does not have any documents responsive to this request.


**DOCUMENT REQUEST NO. 14**:

Copies of all press releases regarding the PureTunes Site, and any other communications with the press regarding the PureTunes Site.

**RESPONSE TO REQUEST NO. 14**:

Sakfield does not have any documents responsive to this request.


Dated: 3 September 2003                          Respectfully submitted,


_____
Lawrence M. Sung (DC Bar No. 442021)
Jeff E. Schwartz (DC Bar No. 442804)
PRESTON GATES ELLIS &
ROUVELAS MEEDS LLP
1735 New York Avenue, NW, Suite 500
Washington, DC 20006-5209
(202) 628-1700

9

## CERTIFICATE OF SERVICE

I hereby certify that this 3rd day of September 2003, the foregoing DEFENDANT SAKFIELD HOLDING COMPANY S.L.'S RESPONSES TO PLAINTIFFS' FIRST REQUEST FOR DOCUMENTS were served, via email and Federal Express, on:

> Thomas J. Perrelli
> Jenner & Block LLC
> 601 Thirteenth Street, NW
> Suite 1200 South
> Washington DC  20005-3823
> tperrelli@jenner.com

> _____
> Lawrence M. Sung
> PRESTON GATES ELLIS &
> ROUVELAS MEEDS LLP
> 1735 New York Avenue, NW
> Suite 500
> Washington, DC  20006-5209

# EXHIBIT 5

**OPPOSITION TO DEFENDANT SAKFIELD
HOLDING COMPANY S.L.'S MOTION TO DISMISS**

# Preston|Gates|Ellis &
## Rouvelas|Meeds LLP

Lawrence M. Sung
lsung@prestongates.com
202-661-3715

15 September 2003

*via email and first class mail*

Steven B. Fabrizio
Jenner & Block LLC
601 Thirteenth Street, NW
Suite 1200 South
Washington, DC 20005-3823

Re:    Arista Records, Inc. v. Sakfield Holding Company S.L.,
No. 03-1474 (RCL) (D.D.C. 2003)

Dear Steve:

Thank you for your 15 September 2003 letter to Jeff E. Schwartz regarding the Plaintiffs' proposal for a jurisdictional discovery schedule in view of Sakfield's pending motion to dismiss for lack of jurisdiction. As we discussed by telephone today, Sakfield is unable to agree to your proposal. Furthermore, I understand that your clients will not agree to our counter-proposal, which would involve the prerequisite of an appropriate protective order as well as the temporary cessation of third party discovery until after the Plaintiffs have had an opportunity to propound interrogatories to Sakfield and conduct a subsequent deposition of a Sakfield representative in Spain.

This counter-proposal, of course, does not indicate Sakfield's acquiescence to your contentions regarding entitlement to discovery of the sort you have detailed (particularly those of a scope well beyond a jurisdictional inquiry), but rather is in the interest of achieving a mutually agreeable schedule for progress of this case without court intervention. We regret that we are unable to reach an accord in this regard.

In any event, we look forward to receiving your opposition filing tomorrow. Thank you.

Sincerely,

Lawrence M. Sung

A LAW FIRM     A LIMITED LIABILITY PARTNERSHIP INCLUDING OTHER LIMITED LIABILITY ENTITIES

1735 NEW YORK AVENUE NW, SUITE 500  WASHINGTON, DC 20006-5209  TEL: (202) 628-1700  FAX: (202) 331-1024  www.prestongates.com
Anchorage  Coeur d'Alene  Hong Kong  Los Angeles  Orange County  Palo Alto  Portland  San Francisco  Seattle  Spokane  Washington, DC

# EXHIBIT 6

**OPPOSITION TO DEFENDANT SAKFIELD
HOLDING COMPANY S.L.'S MOTION TO DISMISS**

Dedicated Server + pipe    Spain / Madrid

# cogent
### COMMUNICATIONS

1015 31st Street, N.W.
Washington, D.C. 20007
Ph: 202-295-4200
Fx: 202-318-2938

**Carrier / Service Provider**
**Customer Subscriber Agreement**

Cogent Internet

ORDER DATE: 31 JAN 03    REQUEST FOR SERVICE DATE: 01 MAR 03    SBED ORDER NO. LX-BJ

ORDER TYPE: B  New ☐  Renewal    ☐  Cancellation

INDUSTRY TYPE: Entertainment

| | BANDWIDTH | TERM | RATE |
| --- | --- | --- | --- |
| Transit | 80 Mbps / Gbps | 12 Months | 5000 Service Charge | 0 Installation Service |
| Transport | Mbps / Gbps | Months | Service Charge | Installation Service |

## BILLING INFORMATION (if different from Service)

Customer Name: Sakfield, Inc.  Sakfield Inc
Billing Address: C/ Guzman el Bueno, 21 - 4ª deha
C/ Guzman el Bueno
Suite/Floor: #21  Floor 4
City/State/Zip: 28015 Madrid Spain  28015 Madrid
Contact: F.J. Siguenza
Telephone: 34 91 550 04 71    3491 563 6651
Fax: 34 91 550 03 72    3491 550 0372
E-mail: sakfield@postmaster.co.uk

## SERVICE INFORMATION

Customer Name: RACO / Sakfield Inc
Service Address: 151 Front St.
Cogent Node: 110290
Suite/Floor: 704
City/State/Zip: Toronto, Ontario M5J 2N1
Contact: Peter Burns  Peter Burns / Henry Wilson  709 621326
Telephone: (416) 369-1161  416-369-1161
Fax: (416) 365-2552  416 365 2552
E-mail: peter.burns@cogentco.com

ADDITIONAL SITES:    ☐ Yes (use attached Additional Locations list)    ☒ No

716 852 79
233

## CUSTOMER AGREEMENT: Please read the attached Terms and Conditions and sign here to indicate your acceptance.

Signature: FJC
Name: F.J. Siguenza    E. J. Siguenza
Title: Director    Director    Date: 31 Jan 03

Cogent Account Rep: C. Nespera
Telephone: 416-217-3091
Cogent Management Approval:

Ref. ID Number:
E-mail: cnespera@cogentco.com
Fax: Jan 31/03

## CREDIT CHECK

Customer Legal Name: Sakfield, Inc.    Tax ID #: NONE
D&B Listed?    ☐ Yes    ☒ No    If Yes, DUNS #:
Bank Reference:    Account No.:
Trade References (list two): New company. Will pay for months in advance.
Name: Money is being wired to Cogent SunTrust account
#202-324-8980

We hereby authorize Cogent Communications to obtain any information from the above references.
Signature:
Name: F.J. Siguenza
Title: Director    Phone: 3491 244 21 20    Date: 31 Jan 03

57
12-
722

Cogent 000030

FJ Siguenza    C/ Guzman el Bueno    151 Front St 704
Javier    #21 Floor 4    To On M5J 2N1
Wayne Rosso    Madrid, Spain 280-15


280 002
Madrid

Cogent 000031

## Zulager, Ried

| | |
|---|---|
| **From:** | support@cogentco.com |
| **Sent:** | Friday, May 30, 2003 6:27 PM |
| **To:** | relations@grokster.com |
| **Cc:** | rjenkins@cogentco.com; wkruger@cogentco.com |
| **Subject:** | Customer Acceptance Letter - OE-JK |

5/30/2003

Dear Sakfield Inc.,

Welcome to Cogent Communications' brilliantly fast, elegantly simple, non-oversubscribed optical network! We look forward to a long relationship between our companies. For your records, your order number is OE-JK.

Your service acceptance date is 5/30/2003 and your billing start date is 5/30/2003.

If you have any questions at this time, please reply to this e-mail or call me at 202 295-4300. If not, any future requirements for assistance regarding your circuit or billing related needs will be addressed by our Customer Service department. Customer Service may be reached at the following numbers: Voice: 1-877-7COGENT or (202) 295-4385, Fax: (202) 295-9061 or by sending e-mail to support@cogentco.com . Please reference your order number when contacting Customer Service.

**IF YOUR EQUIPMENT IS NOT ONLINE AT THIS TIME, PLEASE CONTACT SUPPORT AT 877-7COGENT AFTER PLACING IT ONLINE.**

Please ensure your device (CPE) is configured for Full Duplex, 100Mbps or 1000Mbps (Gigabit Ethernet Customers only) and Auto Negotiation Disabled.

The current version of the User Guide can be downloaded by clicking here, please refer to section X for troubleshooting guidance. Hopefully, you will find this helpful if you experience a loss of service.

For your reference, Cogent's authoritative DNS information is as follows.
66.28.0.14 auth1.dns.cogentco.com
66.28.0.30 auth2.dns.cogentco.com

Resolving name servers:
66.28.0.45 res1.dns.cogentco.com
66.28.0.61 res2.dns.cogentco.com

Thank you,
Rhonda Jenkins
Service Delivery Team



1015 31st St., N.W.
Washington, DC 20007
Phone: 202 295-4300
rjenkins@cogentco.com

Cogent  000285

# EXHIBIT 7

## OPPOSITION TO DEFENDANT SAKFIELD
## HOLDING COMPANY S.L.'S MOTION TO DISMISS

REDACTED

----- Original Message -----
**From:** Barb Osika
**To:** barbara@famara.nl
**Cc:** 'Peter Burns' ; peter@racogroup.net ; 'Joanne Willard'
**Sent:** Tuesday, June 24, 2003 2:57 PM
**Subject:** FW: Sakfield Holding Company SL - closing contract

Hi Barbara:

Your email has been forwarded to me by Pete Burns regarding the termination of your Agreement with RACO. I am sorry to hear you will no longer require RACO's services. RACO will be sending a final invoice to Sakfield for July 2003 to include the early termination costs as documented in 4 of the support Services Agreement. With the Agreement scheduled to conclude on March 1, 2004, there would be 8 months remaining for a total of $2,568 calculated as follows:

Space for (1) 19 Inch Rack- $1,200 x 8 months remaining /$9,600 x 25% = $2,400 plus GST $2,568.00

Please find listed below the paragraph 4 as per the Agreement:

4) Either party may terminate this Agreement at any time during the Term by giving written notice to the other party at least ninety (90) calendar days prior to the effective termination date. In consideration of term discounts and the fact that certain of RACO expenses are amortized over the term of this Agreement, in the event CUSTOMER elects to terminate the Agreement without cause under this paragraph, CUSTOMER shall pay, in addition to all other charges accrued through the date of termination, an amount equal to twenty-five percent (25%) of the remaining Fees, set forth on Schedule "B". which would otherwise have been paid through the end of the term by way of liquidated damages.

I understand you are paid current through June 2003. Sakfield will owe RACO for the July invoice for the associated early termination charges. RACO will require payment in full prior to the removal of your equipment.

Cogent 000112

Also attached is RACO's Services Request Form. Upon your request, we will disconnect the Cogent cross-connect from your equipment. Please be assured, RACO will do everything possible to ensure a smooth termination. If you should have any questions, please email me or give me a call at (716) 852-7950, Ext. 225.

Sincerely,

Barbara A. Osika
Manager of Account Services
716-852-7950 ext.225
barb.osika@racogroup.net

cc:  Peter C. Ronca


-----Original Message-----
**From:** Pete Burns [mailto:pete.burns@racogroup.net]
**Sent:** Monday, June 23, 2003 3:30 PM
**To:** Barb Osika
**Subject:** FW: Sakfield Holding Company SL - closing contract


-----Original Message-----
**From:** Barbara Ingenbleek / Famara [mailto:barbara@famara.nl]
**Sent:** Monday, June 23, 2003 11:36 AM
**To:** peter.burns@racogroup.net
**Subject:** Sakfield Holding Company SL - closing contract

Dear Mr. Burns,

Please be informed that we have decided to shut down our web site www.puretunes.com. We would like to terminate our hosting contract with your company with immediate effect.

Would you please be so kind to mail me the confirmation of the closing of our contract?

Yours sincerely,

Barbara Ingenbleek,
managing director


Sakfield Holding Company SL

Office
c/Velázquez 150 - 2° dcha.
28002  MADRID - Spain
VAT-number  B 83638577

Managing Director
Zona Cales, Carrer G, n° 16
12500  VINAROS - Spain
Tel  + 34 964 496 706
Fax  + 34 964 496 351
E-mail  barbara@famara.nl

Cogent  000113

# EXHIBIT 8

**OPPOSITION TO DEFENDANT SAKFIELD HOLDING COMPANY S.L.'S MOTION TO DISMISS**

REDACTED

**From:**   REDACTED
**Sent:**   Wednesday, May 21, 2003 3:06 PM
**To:**   REDACTED
**Subject:** Tested Puretunes out

It ran like clockwork and got the downloads almost instantaneously!  25 free when you sign up. - No promotional ads (yet). Very enjoyable experience.  They need more songs, but have a large collection.

REDACTED


REDACTED

Cogent Communications
Phone: 202-295-4388
Fax: 202-338-8798
Cell: 202-550-5493

Visit www.cogentco.com today!

# EXHIBIT 9

## OPPOSITION TO DEFENDANT SAKFIELD HOLDING COMPANY S.L.'S MOTION TO DISMISS

REDACTED

| | |
|---|---|
| **From:** | REDACTED |
| **Sent:** | Friday, May 23, 2003 10:11 AM |
| **To:** | REDACTED |
| **Cc:** | REDACTED |
| **Subject:** | Cogent Connection |

**REDACTED**

- **Claudio Nespeca** reports: Puretunes.com a Cogent customer in Toronto, maxed-out their 100 mb connection on their first day of operation. according to Henry Wilson from Puretunes, they generated $2,500 in sales in the first few hours of operation. This success is based on word of mouth, as they haven't even begun to advertise yet. The result for **Claudio,** an additional wholesale order worth $15k MRR.

**REDACTED**

Cogent 000176

8/14/2003

# EXHIBIT 10

**OPPOSITION TO DEFENDANT SAKFIELD
HOLDING COMPANY S.L.'S MOTION TO DISMISS**



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARISTA RECORDS, INC., et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 03 1474 RCL |
| v. | ) |
| | ) |
| SAKFIELD HOLDING COMPANY S.L., a Spanish | ) |
| company d/b/a PURETUNES.COM and DOES 1-10, | ) |
| | ) |
| Defendants. | ) |

## PROPOSED ORDER #1

Defendant Sakfield Holding Company S.L.'s Motion to Dismiss for Lack of Personal

Jurisdiction Is Hereby DENIED.

The Clerk is directed to forward copies of this Order to counsel of record.

SO ORDERED.


Entered this __ day of _____ 2003

_____
The Honorable Royce C. Lamberth

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARISTA RECORDS, INC., et al.                    )
                                                )
                        Plaintiffs,             )
                                                )  Civil Action No. 03 1474 RCL
v.                                              )
                                                )
SAKFIELD HOLDING COMPANY S.L., a Spanish        )
company d/b/a PURETUNES.COM and DOES 1-10,      )
                                                )
                        Defendants.             )

## PROPOSED ORDER #2

Upon consideration of Defendant Sakfield Holding Company S.L.'s Motion to Dismiss and Plaintiffs' Opposition thereto, IT IS HEREBY ORDERED that:

1.      Plaintiffs are authorized to undertake jurisdictional discovery for a period of not less than 60 days; additional time shall be granted for such discovery if circumstances warrant;

2.      Defendant Sakfield Holding Company, S.L. is hereby directed to fully and completely respond to discovery propounded to it;

3.      Defendant Sakfield is hereby directed, in response to discovery requests by Plaintiffs, to produce all documents within its possession, its custody, or control, even if such documents are retained by employees, consultants, agents, contractors, or other entities for or on behalf of Sakfield;

4.      Failure to cooperate shall subject Sakfield to appropriate sanctions or penalties;

5.      A further schedule for briefing the motion to dismiss shall be established at the close of jurisdictional discovery.

The Clerk is directed to forward copies of this Order to counsel of record.

SO ORDERED.

Entered this __ day of _____ 2003

                                    _____
                                    The Honorable Royce C. Lamberth

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of September, 2003, the Opposition to Defendant Sakfield Holding Company S.L.'s Motion to Dismiss and proposed orders were served by email and first-class mail on:

> Lawrence M. Sung, Ph.D.
> Preston Gates Ellis & Rouvelas Meeds LLP
> 1735 New York Ave., N.W.
> Suite 500
> Washington, D.C.  20006

Martina E. Vandenberg